# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 18, 2016         Decided November 8, 2016

No. 15-7098

MATTHEW CORRIGAN,
APPELLANT

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-00173)

*Elizabeth M. Rademacher*, Student Counsel, argued the cause for appellant. With her on the briefs were *Tillman J. Breckenridge*, *William R. Cowden*, *Patricia E. Roberts*, and *Jacob M. Derr*, Student Counsel.

*Carl J. Schifferle*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With him on the brief were *Karl A. Racine*, Attorney General, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General.

Before: ROGERS, BROWN and PILLARD, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

Dissenting opinion by *Circuit Judge* BROWN.

ROGERS, *Circuit Judge*: Following two warrantless searches of his home by members of the D.C. Metropolitan Police Department ("MPD"), Matthew Corrigan sued the District of Columbia and individual MPD officers pursuant to 42 U.S.C. § 1983, for violation of his rights under the Fourth Amendment to the Constitution. He now appeals the grant of summary judgment to the defendants, challenging the district court's rulings that there was no constitutional violation and that the officers were entitled to qualified immunity.

Even assuming, without deciding, that the initial "sweep" of Corrigan's home by the MPD Emergency Response Team ("ERT") was justified under the exigent circumstances and emergency aid exceptions to the warrant requirement, the second top-to-bottom search by the Explosive Ordnance Disposal Unit ("EOD") after the MPD had been on the scene for several hours was not. The MPD had already secured the area and determined that no one else was inside Corrigan's home and that there were no dangerous or illegal items in plain sight. Corrigan had previously surrendered peacefully to MPD custody. The information the MPD had about Corrigan — a U.S. Army veteran and reservist with no known criminal record — failed to provide an objectively reasonable basis for believing there was an exigent need to break in Corrigan's home a second time to search for "hazardous materials," whose presence was based on speculative hunches about vaguely described "military items" in a green duffel bag. And assuming, without deciding, that the community caretaking exception to the warrant requirement applies to a home, the scope of the second search

far exceeded what that exception would allow.  In the end, what the MPD would have the court hold is that Corrigan's Army training with improvised explosive devices ("IEDs"), and the post traumatic stress disorder ("PTSD") he suffers as a result of his military service — characteristics shared by countless veterans who have risked their lives for this country — could justify an extensive and destructive warrantless search of every drawer and container in his home.  Neither the law nor the factual record can reasonably be read to support that sweeping conclusion.

Because it was (and is) clearly established that law enforcement officers must have an objectively reasonable basis for believing an exigency justifies a warrantless search of a home, and because no reasonable officer could have concluded such a basis existed for the second more intrusive search, the officers were not entitled to qualified immunity across the board.  Accordingly, we reverse the grant of summary judgment in part and remand the case for further proceedings.  Upon remand, the district court can address a remaining claim of qualified immunity based on reasonable reliance on a supervisor's order and Corrigan's claim of municipal liability, which the district court did not reach.

**I.**

Matthew Corrigan is an Army Reservist and an Iraq war veteran who, in February 2010, was also an employee of the U.S. Department of Labor's Bureau of Labor Statistics.  On the night of February 2, 2010, suffering from sleep deprivation, he inadvertently phoned the National Suicide Hotline when dialing a number he thought to be a Veterans Crisis Line.  When he told the Hotline volunteer that he was a veteran diagnosed with PTSD, she asked whether he had been drinking or using drugs and whether he owned guns.  Corrigan assured her that he was

only using his prescribed medication and was not under the influence of any illicit drugs or alcohol; he admitted that he owned guns. The volunteer told him to "put [the guns] down," and Corrigan responded, "That's crazy, I don't have them out." Corrigan Dep. 56:2–5. Despite Corrigan's assurances that his guns were safely stored, the volunteer repeatedly asked him to tell her "the guns are down." *Id.* 56:2–14. When asked if he intended to hurt himself or if he intended to "harm others," he responded "no" to both questions. *Id.* 69:6–18. Frustrated, Corrigan eventually hung up and turned off his phone, took his prescribed medication, and went to sleep. *Id.* 56:10–14; 70:6–7. The Hotline volunteer proceeded to notify the MPD.

At approximately 11:13 p.m., according to the February 9, 2010, Barricade Report from Lieutenant Glover to the MPD Chief of Police, officers from the MPD Fifth District were dispatched to Corrigan's home for "Attempted Suicide." Barricade Rpt. 1. Certain undisclosed "information" led them "to believe the subject was possibly armed with a shotgun." *Id.* Corrigan lived at 2408 North Capitol Street, in Northwest D.C., in the basement apartment of a row house that had its own front and back doors. Upon arrival, the officers thought they detected a "strong odor" of natural gas and contacted the gas company, which turned off the gas to the row house. *Id.*; D.C. Super. Ct. Tr. 113-14. The officers contacted Lieutenant Glover at home and he, in turn, gave orders to declare a "barricade situation," which meant that the ERT also went to Corrigan's home. The MPD Command Information Center advised that Corrigan, a white male, age 32, had no known criminal record and there were no outstanding protective orders against him. An ERT investigator learned that Corrigan was a U.S. Army combat veteran who had served recently during the Iraq war and owned a rifle and several handguns. Additionally, he had recently terminated a romantic relationship and was under psychiatric care for PTSD and depression. He also had a dog.

At 2:00 a.m., the ERT assumed tactical control of the situation. At 2:10 a.m., the MPD began to secure the perimeter around Corrigan's home, including evacuating his neighbors. Barricade Rpt. 2; *see* D.C. Super. Ct. Tr. 113-14. At 2:30 a.m., Lieutenant Glover arrived on the scene and called on the EOD to respond. According to Lieutenant Glover's testimony, Corrigan's upstairs neighbor, who was his landlady, had told MPD officers that Corrigan occasionally had overnight guests, including an ex-girlfriend. *See* Glover Dep. 16:20–22; 33:1–5. An officer had reached the ex-girlfriend by cell phone, and she said Corrigan was a veteran taking prescribed medication for PTSD, had expertise in IEDs, and trained others in detecting and mitigating IED incidents. *Id.* 35:11–37:6. She also recalled seeing a green duffel bag containing "military items" in Corrigan's home that she had been told "not to touch" because "they were his guns and military stuff." *Id.* 36:17–21.

Around 3:00 a.m., MPD negotiators attempted to speak with Corrigan by dialing his cell phone number, calling his name over a public address system, and knocking or kicking his front door. The MPD had no indication, however, that Corrigan's failure to answer the door was suspicious. The officers had been told by his landlady and ex-girlfriend that Corrigan was likely sleeping, having taken his prescribed medication; his voicemail message stated "Hi, you've reached Matt, if I'm unavailable, I'm probably asleep." Indeed, his landlady, upon being advised that the reason for the police presence was Corrigan's attempted suicide, had insisted that was "outrageous" and repeatedly told the MPD officers that there was "a big misunderstanding" because she had known Corrigan for two years and had "never felt more comfortable with a neighbor in [her] life." D.C. Super. Ct. Tr. 106, 110. She had explained to the officers that Corrigan had guns because he was in the military and that his home had electric, not gas, appliances.

Corrigan testified that around 4:00 a.m. he became aware of someone kicking at his front door, and then his back door, and was "terrified," feeling he was being "hunted." Corrigan Dep. 70:11–21. He moved from his bedroom to the bathroom where he felt safest and tried to go back to sleep. *Id*. 70:21–71:3. When he turned on his cell phone at 4:16 a.m., *see* Barricade Rpt. 4, he received a flood of voicemails. He returned the call of the detective who was one of the MPD negotiators. Corrigan initially said he was at another address, because he was scared, but within minutes admitted he was at home. Having noticed the flood light and all the police officers at the front and back of his home, he told the negotiator he was coming outside but needed to put on clothes because of the fallen snow. He described the clothes he would be wearing and that his cell phone would be in his left hand when he came out so the police would not shoot him because they thought he had a gun. Corrigan Dep. 76:12, 21-22.

Exiting his home within 20 minutes of first speaking to the negotiator, Corrigan closed and locked his front door so his dog would not get out and no one could enter his home. Corrigan Dep. 96:18–19; *see also id.* 77:6-17. In order to appear as non-threatening as possible, he knelt on the ground and lay on his back. MPD officers immediately secured his hands with a white "zip-tie," searched his person (on which he had only a military identification card and his cell phone), and took him to a police vehicle where he was told he had not committed any crime and the officers only wanted to talk to him. *See id.* 97–98. Eventually, he was taken to a Veterans Hospital where he voluntarily admitted himself for PTSD symptoms triggered by the night's events. First Am. Compl. ¶ 19.

When Corrigan was questioned prior to being removed from the scene by the MPD, he refused to give his house key to an MPD officer or to consent to the MPD entering his home.

The officer who had asked for his key told him: "I don't have time to play this constitutional bullshit. We're going to break down your door. You're going to have to pay for a new door." Corrigan Dep. 94:15–18. Corrigan responded, "It looks like I'm paying for a new door, then. I'm not giving you consent to go into my place." *Id*. 94:19–21.

After Corrigan was in MPD custody, Lieutenant Glover ordered the ERT, led by Sergeant Pope, to break in Corrigan's home to search for "any human threats that remained or victims." Glover Dep. 10:15–17. Glover testified that he thought the "sweep" of Corrigan's home was necessary because the officer who spoke to Corrigan's ex-girlfriend had not reported whether he asked her whereabouts or visually confirmed her location; Corrigan's ex-girlfriend or other persons had stayed overnight in his home, so other persons could have been present; a gas leak had been reported and Corrigan had initially "dece[ived]" the police about his location and had told the Hotline volunteer that he did not intend to harm "others," potentially implying that someone else might be inside. *Id*. 13–14, 40. As a matter of course, Glover explained, if an ERT unit is called to a scene it goes inside 99.9% of the time, *see id*. 18:12-14, because "[s]tandard protocol" assumes "if there's one [person inside] there's two, if there's two there's three, if there's three there's four, and exponentially on up," *id*. 13:18-21.

Upon breaking in Corrigan's home, the ERT encountered only Corrigan's dog; no one was found inside and no dangerous or illegal items were in plain view. Nonetheless, Lieutenant Glover thereafter ordered the EOD, led by Officer Leone, to break in Corrigan's home again to search for "any hazardous materials that could remain on the scene and be dangerous to the public or anybody else in that block or area." *Id.* 10:17–22. In Glover's view, a thorough top-to-bottom warrantless search was necessary because the EOD had not cleared Corrigan's home of

any hazardous materials or devices. Glover said he believed such hazards "to be possibly inside" based on Corrigan's ex-girlfriend's reference to a duffel bag containing unspecified "military items." *Id.* 57:16-17. During the second MPD search, EOD officers cut open every zipped bag, dumped onto the floor the contents of every box and drawer, broke into locked boxes under the bed and in the closet, emptied shelves into piles in each room, and broke into locked boxes containing Corrigan's three firearms. *See* Pl.'s Answers to Interrogs., ¶ 8; First Am. Compl. ¶ 22. Inside the locked boxes, the EOD found, and seized, an assault rifle, two handguns, a military smoke grenade, a military "whistler" device, fireworks, and ammunition.

Corrigan was charged that day, February 3, 2010, with three counts of possession of an unregistered firearm and seven counts of unlawful possession of ammunition. Later, when he was released from the Veterans Hospital into police custody he was arraigned in the D.C. Superior Court, after spending three days in the central cell block. He was held at D.C. jail until he was released on his own recognizance on February 19. Upon returning home, Corrigan found his home in complete disarray: the police had left the contents of his bureau drawers and shelves scattered on the floor, his electric stove had been left on, and the front door of his home was left unlocked. First Am. Compl. ¶ 22; Pl.'s Answers to Interrogs., ¶ 8. On April 19, 2012, the D.C. Superior Court judge granted Corrigan's motion to suppress the seized firearms and ammunition, finding that the government could not show facts justifying the warrantless entry and search of his home. *Dist. of Columbia v. Corrigan*, No. 2010 DCD 2483, Super. Ct. Tr. 10 (Apr. 19, 2012). The District government *nolle prossed* all the charges.

Meanwhile, on February 1, 2012, Corrigan sued the District of Columbia and individual MPD officers, pursuant to 42 U.S.C. § 1983, alleging that the warrantless entries and

searches of his home, and the seizure of his property from his home, violated the Fourth Amendment. First Am. Compl. ¶ 27. The district court, following discovery and dismissal of some officers from the case, initially denied the remaining defendants' motion for summary judgment, but *sua sponte* reconsidered and granted summary judgment. It ruled that no Fourth Amendment violation had occurred in view of the exigent circumstances, and that if the community caretaking doctrine applied to a home, it would also justify the searches. The district court ruled there had been no violation of a clearly established right, concluding the officers were entitled to qualified immunity.

## II.

Corrigan contends that neither the ERT "sweep" for injured persons nor the EOD search for "hazardous materials" was reasonable under the Fourth Amendment because the officers lacked a reasonable basis for believing that exigent circumstances necessitated their entry and search. Further, he contends that the MPD officers should not receive qualified immunity because it is clearly established that the police may not enter and search a home without a warrant "when there is no indication that anyone else is present in the home, or that there is imminent danger to law enforcement or the public necessitating immediate entry." Appellant's Br. 8. He points out that the officers knew only that he was a military veteran suffering from PTSD and allegedly threatening suicide, that he had been trained to mitigate IEDs, that he possessed a duffel bag containing "military items," and that officers had smelled gas upon first arriving at the row house where Corrigan lived, but had no reason to believe that he had any intent to harm others or materials to do so. The district court's application of the exigent circumstances, emergency aid, and community caretaking exceptions to the warrant requirement were thus flawed because the officers lacked the requisite indication of imminent danger.

At the very least, any search must be tailored to the exigent need, and the EOD's "broad and vigorous search was unreasonable because it was not [so] tailored." *Id*. at 9. Corrigan also emphasizes that at no time during the five-hour barricade did the officers make any apparent attempt to obtain a search warrant.

Our review of the grant of summary judgment is *de novo*. *See Wesby v. Dist. of Columbia*, 765 F.3d 13, 18–19 (D.C. Cir. 2014). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The latter is reviewed *de novo*, but this court in considering the former, "like the district court, [must] 'examine the facts in the record and all reasonable inferences derived therefrom in a light most favorable to the nonmoving party.'" *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016) (quoting *DeGraff v. Dist. of Columbia*, 120 F.3d 298, 299–300 (D.C. Cir. 1997)).

"The doctrine of qualified immunity protects police officers 'from suit under 42 U.S.C. § 1983 unless they have violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'" *Fox v. Dist. of Columbia*, 794 F.3d 25, 29 (D.C. Cir. 2015) (quoting *City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015)). To overcome the officers' claim to qualified immunity, the court must determine (1) whether the facts in the record show the officers' conduct violated a constitutional right, and if so, (2) whether the constitutional right was clearly established at the time of the incident. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (summarizing two-step analysis in *Saucier v. Katz*, 533 U.S. 194 (2001)). We address both questions to avoid "leav[ing] the standards of official conduct permanently in limbo." *Camreta v. Greene*, 563 U.S. 692, 706 (2011).

**A.**

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

At its core, the Fourth Amendment protects "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (quoting *United States v. U.S. Dist. Court*, 407 U.S. 297, 313 (1972)). Warrantless searches and seizures inside a home are "presumptively unreasonable," *Payton v. New York*, 445 U.S. 573, 586 (1980), "subject only to a few specifically established and well-delineated exceptions," *Katz v. United States*, 389 U.S. 347, 357 (1967). Unless there is evidence to show "'exigent circumstances'" or another exception sufficient to justify a warrantless entry, the MPD searches violated Corrigan's Fourth Amendment right. *See Coolidge v. New Hampshire*, 403 U.S. 443, 477–78 (1971). "[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify [a] warrantless search[] . . . ." *Welsh*, 466 U.S. at 749–50.

Here, the MPD officers rely on three exceptions to the warrant requirement: exigent circumstances; the emergency aid doctrine; and the community caretaking doctrine as extended to

a home. Because the emergency aid doctrine is essentially a type of exigent circumstance, *see Brigham City v. Stuart*, 547 U.S. 398, 403 (2006), we analyze them together.

**1.** Exigency can justify a warrantless search "when there is *compelling need* for official action and *no time* to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 509 (1978) (emphases added). Without providing an exclusive list, the Supreme Court has recognized several exigent circumstances that could justify a warrantless entry and search, such as the hot pursuit of a fleeing suspect, *United States v. Santana*, 427 U.S. 38, 42–43 (1976); the need to prevent the imminent destruction of evidence, *Kentucky v. King*, 563 U.S. 452, 460–61 (2011); and situations, as the MPD claimed here, where there is a "need to protect or preserve life or avoid serious injury," *Brigham City*, 547 U.S. at 403 (internal quotation marks omitted). Whether exigent circumstances exist to justify a warrantless search "is judged according to the totality of the circumstances" and on "what a reasonable, experienced police officer would believe." *In re Sealed Case*, 153 F.3d 759, 766 (D.C. Cir. 1998) (internal quotation marks omitted).

When relying on an exigent circumstances exception to the warrant requirement, the officers must have "at least probable cause to believe that one or more of the . . . factors justifying entry were present." *Minnesota v. Olson*, 495 U.S. 91, 100 (1990). As this court explained in *United States v. Dawkins*, 17 F.3d 399, 403 (D.C. Cir. 1994), "an exception to the warrant preference rule . . . does not alter the underlying level of cause necessary to support entry." The police must, the Supreme Court has repeatedly emphasized, have "an objectively reasonable basis for believing" that the urgent and compelling need that would justify a warrantless entry actually exists. *Brigham City*, 547 U.S. at 406; *Michigan v. Fisher*, 558 U.S. 45, 47 (2009); *Mincey v. Arizona*, 437 U.S. 385, 392 (1978); *In re*

13

*Sealed Case*, 153 F.3d at 766; *United States v. Mason*, 966 F.2d 1488, 1492 (D.C. Cir. 1992); *United States v. Timberlake*, 896 F.2d 592, 597–98 (D.C. Cir. 1990).  Additionally, a search pursuant to the exigent circumstances exception must be "no broader than necessary," *Mason*, 966 F.2d at 1492, and "strictly circumscribed by the exigencies which justify its initiation," *Mincey*, 437 U.S. at 393 (internal quotation marks omitted).

The Fourth Amendment requires reasonableness based on particular circumstances in order to meet the officers's heavy burden to justify a warrantless search of a home.  For instance, in *Fisher*, 558 U.S. at 45, 48, the Supreme Court upheld a warrantless entry into a home where officers responded to a disturbance complaint at the home and were informed the defendant was "going crazy" inside, which they confirmed upon observing that windows were broken and there was fresh blood on a wrecked car outside, supporting the reasonable belief that the defendant required aid.  Similarly, in *Brigham City*, 547 U.S. at 406, the Court upheld officers' warrantless entry to break up a fight after they observed a fracas in which punches were exchanged, causing one man to spit blood.  In *Mason*, 966 F.2d at 1492–93, this court upheld a warrantless search where officers responded to a reported shooting, found the victim and, when they returned to the victim's home, found the door open and heard voices within such that it was reasonable to believe another victim might be in need of assistance or that the shooters had returned to the home.  And this court has noted that evidence suggesting the presence of a bomb or explosive device might constitute exigent circumstances.  *Cf. Dawkins*, 17 F.3d at 406 n.8.

The two separate MPD warrantless searches of Corrigan's home are distinguishable by the level of their intrusiveness, *see generally, e.g.*, *Birchfield v. North Dakota*, 136 S. Ct. 2160 (2016), and the evidence shows a much more

intrusive second search.  Even assuming *arguendo* that the totality of circumstances could support the ERT's protective "sweep" to look for the ex-girlfriend, there was no objectively reasonable factual basis for the MPD to believe an imminently dangerous hazard could be present in Corrigan's home, particularly after completing the "sweep."

First, the officers had no reasonable basis for believing that imminently dangerous "hazardous materials," like an explosive device, were in Corrigan's home.  The officers were presented with a U.S. Army veteran and reservist with no known prior interaction with the police nor pending legal order against him.  They had no information that he had explosives or other volatile, hazardous materials in his home that if left unattended could present a danger to others or to the police.   There is no evidence that the ex-girlfriend ever said she saw or believed that Corrigan possessed explosives, only that he had a "green duffel bag" with "military items" — "guns and military stuff" — that she was told "not to touch."  Glover Dep. 36:17–21.  The MPD learned he had firearms and IED training as a result of his military service, but had no information that he built IEDs or kept IED-making materials in his home.  And the MPD had obtained no corroboration that he was likely to harm himself or others — let alone that he would do so by setting up an explosive or otherwise hazardous device ready to detonate in his home where he had left his dog.

Further, having determined as a result of the ERT "sweep" that no individual or dangerous property was seen inside Corrigan's home, the claimed basis for believing exigent circumstances existed had abated.  Most obviously, the MPD knew no one was inside of Corrigan's home in need of assistance or capable of causing harm.  His upstairs neighbor and landlady had told the officers that the reported smell of gas must have come from the upstairs apartment because Corrigan

did not have gas appliances. In any event, the gas to the entire building had been turned off by the gas company hours earlier. Officer Leone, leading the EOD search team, acknowledged there was no smell of gas when entering Corrigan's home and knew that gas is not used to make explosive devices. *See* Leone Dep. 108:10–11; 61:7–9. By the time of the EOD search, Corrigan was in MPD custody and neither his statements to MPD officers nor his actions upon being awakened and surrendering to the MPD indicated he was an ongoing threat. Nor had his landlady, who had known him for two years, or his ex-girlfriend — the only two people the MPD had contacted who knew him personally — indicated he had acted in erratic or dangerous ways to threaten others, or threatened to take his own life, or been physically abusive. In sum, the second warrantless break in of Corrigan's home by the EOD was based on nothing more than "a bare[] possibility," *Evans v. United States*, 122 A.3d 876, 882 (D.C. 2015), that he might have explosives that would ignite, a possibility the evidence shows was based on runaway speculation.

Second, the officers' own delay during the hours-long barricade belies the notion that another *immediate* break in was reasonable, much less urgently needed. *See Mincey*, 437 U.S. at 392; *Dawkins*, 17 F.3d at 403. "Any warrantless entry based on exigent circumstances must, of course, be supported by a *genuine exigency*." *King*, 563 U.S. at 470 (emphasis added). Not only had the MPD fully secured the area, MPD officers had been on the scene for five hours. Yet at no point did any officer attempt to seek a warrant despite ample time and opportunity to do so. The MPD had time to conduct a further investigation of Corrigan and, if they concluded there was sufficient evidence, to apply for a search warrant as the Fourth Amendment demands. *See generally Birchfield*, 136 S. Ct. at 2173. To believe the exigency continued even after the gas was turned off, Corrigan's surrender to MPD custody and the ERT's

unproductive "sweep," the officers would have to speculate, without factual support, that Corrigan had hidden a device set to trigger an explosion remotely. This would not have been "objectively reasonable." *Brigham City*, 547 U.S. at 406.

Third, the scope of the "exhaustive and intrusive" search was unreasonably broad, with EOD officers rifling through every concealed space in Corrigan's home and breaking open closed containers. *See Mincey*, 437 U.S. at 389. Such a top-to-bottom search falls far outside the bounds of reasonableness given what the officers knew at the time and the Supreme Court's clear admonition that warrantless searches pursuant to an exigent circumstances exception be "strictly circumscribed by the exigencies which justify its initiation." *Id.* at 393 (quoting *Terry v. Ohio*, 392 U.S. 1, 25–26 (1968)); *Florida v. Royer*, 460 U.S. 491, 500 (1983); *Cupp v. Murphy*, 412 U.S. 291, 295 (1973). Even "[u]rgent government interests are not a license for indiscriminate police behavior." *Maryland v. King*, 133 S. Ct. 1958, 1970 (2013). To hold otherwise would condone the officers' implicit and patently unreasonable view that whenever MPD officers break in a veteran's home in response to a possibility that an occupant may be a danger, they may also re-enter to search the *entire* premises by breaking into locked containers for potential but unidentified military items. No precedent, even in the context of potentially explosive devices, supports the officers tearing open containers and prying open locked boxes when conducting a warrantless search based on conjecture that hazardous substances might be present.

While these binding precedents resolve the Fourth Amendment issue here, we note that the out-of-circuit cases discussed by the parties in which exigent circumstances justified warrantless home searches involved starkly different factual circumstances. For instance, in *Mora v. City of Gaithersburg*, 519 F.3d 216 (4th Cir. 2008), a healthcare hotline operator

reported that Mora had called, said he was suicidal, admitted having weapons in his home, and stated he could understand shooting people at work, and that he "might as well die at work." *Id*. at 220. The police confirmed with Mora's co-worker that his threats should be taken seriously. *Id*. Less than fifteen minutes after receiving the operator's call, the officers apprehended and handcuffed Mora while they conducted a search of his home and vehicle. *Id*. By contrast, the record here is silent on the point: Even assuming that Corrigan was in emotional distress when he mistakenly called the National Suicide Hotline, there is no evidence that Corrigan had made any suicidal or aggressive statements or innuendoes to the Hotline volunteer, and neither his landlady nor ex-girlfriend said he posed a risk of serious bodily injury or death to himself or others. Without a reason to believe that Corrigan was prepared to inflict such harm, there was no exigent circumstance justifying the EOD search. *See Olson*, 495 U.S. at 101. Moreover, unlike here, the officers in *Mora* conducted a single search of the home immediately and found and removed guns that, in the hands of a suicidal Mora, they viewed as posing a risk of a workplace massacre. *Mora*, therefore, provides little support for the officers' contention that the MPD's second search of Corrigan's home was constitutional, given that the EOD search occurred after any objective basis for an imminent threat had dissipated as a result of the ERT "sweep."

So too, in *United States v. Infante*, 701 F.3d 386 (1st Cir. 2012), the circumstances were markedly different from what the officers faced here. There, the firefighters' entry and search of the defendant's home was in response to a call about a "propane explosion" that had severed the defendant's finger. *Id.* at 393. Upon arrival they saw "significant injuries, including multiple shrapnel-type wounds on [defendant's] chest," and "a blood trail in a hallway between two doorways," making it reasonable for the firefighters to believe an emergency existed due to "the

prospect of a secondary explosion resulting from escaping gas." *Id.* Similarly, in *United States v. Boettger*, 71 F.3d 1410, 1415 (8th Cir. 1995), the police responded to an actual explosion and investigated further "to ascertain the cause of the explosion and detect other devices which could explode." So too in *United States v. Martin*, 781 F.2d 671, 674–75 (9th Cir. 1985), the officer responding to a report of an explosion at the defendant's home searched in order "to determine the cause of the explosion and to ensure that additional explosions or fire would not occur." And in *United States v. Urban*, 710 F.2d 276, 278–79 (6th Cir. 1983), a warrantless search for "potentially explosive chemicals" was upheld after firefighters responding to a burning building found large quantities of the chemicals used in the manufacture of fireworks. By contrast, in *United States v. Yengel*, 711 F.3d 392, 394, 398 (4th Cir. 2013), the police were not justified in searching an evacuated home based solely on the report of the defendant's wife that he had a grenade because, much as in Corrigan's case, there was nothing to support a conclusion that the grenade was "live" and might detonate at any moment.

Supreme Court precedent has revered the sanctity of the home, condemning warrantless searches absent an actual exigency based on objective facts. *See, e.g.*, *Coolidge*, 403 U.S. at 478. This court, like other circuits, views "the test for exigent circumstances [a]s whether [the] police had an 'urgent need' or 'an immediate major crisis in the performance of duty affording neither time nor opportunity to apply to a magistrate [for a search warrant].'" *In re Sealed Case*, 153 F.3d at 766 (citations and internal quotations omitted). Lacking an objective basis for the belief that vaguely defined "hazardous materials" required immediate re-entry in Corrigan's home, the extensive EOD search far exceeded the bounds of reasonableness.

**2.** In *Cady v. Dombrowski*, 413 U.S. 433 (1973), where the community caretaking doctrine originated, a Chicago police officer was detained at the scene of a single-vehicle accident on a highway in Wisconsin. The Wisconsin officers had the car towed to a private garage and searched the car without a warrant because they believed that Chicago police officers were required to carry their service revolvers at all times. The Wisconsin officers were concerned "for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle." *Id*. at 447. When searching the front seat, glove compartment, and trunk, they found no weapon but discovered evidence of a possible homicide. *Id*. at 437. The Supreme Court concluded that there was no Fourth Amendment violation because the officers undertook the search as part of their "community caretaking function[], totally divorced from the detection, investigation, or acquisition of evidence relating to" a crime. *Id*. at 441.

Because the Supreme Court's reasoning in *Cady* focused on attributes unique to vehicles, some circuits have confined the community caretaking exception to automobiles. *See, e.g.*, *Ray v. Twp. of Warren*, 626 F.3d 170, 177 (3d Cir. 2010); *United States v. Bute*, 43 F.3d 531, 535 (10th Cir. 1994); *United States v. Erickson*, 991 F.2d 529, 532 (9th Cir. 1993); *United States v. Pichany*, 687 F.2d 204, 207–09 (7th Cir. 1982). The Fifth and Eighth Circuits have extended the exception to warrantless searches of the home, *see United States v. York*, 895 F.2d 1026, 1029 (5th Cir. 1990); *United States v. Quezada*, 448 F.3d 1005, 1007–08 (8th Cir. 2006), but the authorized scope of the searches has been quite limited. The Sixth Circuit appears to have equivocated. *Compare United States v. Rohrig*, 98 F.3d 1506, 1521–25 (6th Cir. 1996), *with Goodwin v. City of Painesville*, 781 F.3d 314, 331 (6th Cir. 2015) and *United States v. Williams*, 354 F.3d 497, 508–09 (6th Cir. 2003). Neither this court nor the D.C. Court of Appeals has held that the community caretaking

exception applies to a home. *United States v. Proctor*, 489 F.3d 1348, 1353 (D.C. Cir. 2007); *Hawkins v. United States*, 113 A.3d 216, 222 (D.C. 2015).

The instant case does not require the court to decide whether the community caretaking doctrine applies to a home because even assuming it may, the officers point to no authority as would justify the EOD search. In cases where this doctrine justified a warrantless search of a home, the police officers were presented with circumstances requiring immediate action if they were to fulfill their caretaking function, and the ensuing searches were characterized by brevity and circumspection. *See generally Quezada*, 448 F.3d at 1006; *Rohrig*, 98 F.3d at 1521–25; *York*, 895 F.2d at 1028–30. Here, the MPD had been on the scene for five hours and fully secured the area prior to the EOD entry and search, and Corrigan was in MPD custody after surrendering peacefully. There was ample time and opportunity for the MPD to investigate further and, as appropriate, to seek a search warrant. Yet, instead of doing so, the officers conducted another, more invasive search of Corrigan's home.

Although Lieutenant Glover testified that the MPD officers were not concerned with arresting anyone at the time, *see* Glover Dep. 101:4, the purpose of the EOD search cannot be characterized as altogether divorced from "the detection, investigation, or acquisition of evidence relating to" a crime, *Cady*, 413 U.S. at 441. Based on their own statements, the officers acted not solely to ensure public safety as community caretakers, but to investigate whether Corrigan had left explosive or hazardous materials set to explode — activity that would have been criminal. Had the officers found what they claim they sought — hazardous materials set to explode — such would not be any less evidence of a crime just because it might also require a public-safety response. *See In re Sealed Case*, 153 F.3d at 766. Of course, if the officers had an objectively reasonable basis to

think explosives were in Corrigan's home, that could have presented an exigent circumstance for re-entry, not an occasion to invoke the community caretaking exception.

Consequently, upon viewing the evidence in the light most favorable to Corrigan as the non-movant, *Robinson*, 818 F.3d at 8, we conclude that the officers fail to demonstrate that the extensive EOD search of Corrigan's home was justified by any plausible exigency. And assuming, without deciding, that the community caretaking doctrine applies to a home, the officers lacked probable cause to believe that there was a risk to the community demanding the kind of swift, warrantless response that doctrine would authorize. We therefore hold that the EOD search violated Corrigan's rights under the Fourth Amendment.

**B.**

The Supreme Court has distinguished between the reasonableness inquiries for Fourth Amendment and qualified immunity purposes. *See Anderson v. Creighton*, 483 U.S. 635, 643 (1987). Public officials sued in their individual capacities are entitled to qualified immunity so long as their actions were objectively reasonable under the law "clearly established" at the time. *Sheehan*, 135 S. Ct. at 1774. The law is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. This "do[es] not require a case directly on point, [so long as] existing precedent . . . [has]" placed the statutory or constitutional question beyond debate." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011). In assessing a claim of qualified immunity, the facts must be taken "in the light most favorable to the party asserting the injury." *Saucier*, 533 U.S. at 201.

For the brief and limited warrantless ERT "sweep" of Corrigan's home, the officers had a sufficiently reasonable basis for believing there was probable cause to look for a potentially injured and incapacitated person as to entitle them to qualified immunity. Lieutenant Glover had been informed that Corrigan had a girlfriend with whom he had a falling-out and that her whereabouts were unknown at the time Corrigan exited his home. Corrigan had initially misled the officers about his location and delayed exiting his home after answering their phone calls. Glover had also been informed that Corrigan had said that he did not intend to harm "anyone else," which might imply he had harmed someone but intended no further harm to others. Glover Dep. 14:10–12. This information is ambiguous and the MPD officers failed to take obvious steps to clarify it. No information placed the ex-girlfriend at Corrigan's home that night, and when speaking with her by phone the officers never asked where she was and whether she was safe, much less attempted to confirm her location. They also did not ask Corrigan about the putative "anybody else" statement. Although a close question, the information known to Glover suggested that a reasonable officer on the scene could have believed that there was probable cause to order a brief "sweep" to check whether the ex-girlfriend was injured and remained incapacitated inside Corrigan's home. *See Sheehan*, 135 S. Ct. at 1777; *Ashcroft*, 563 U.S. at 743. Consistent with that belief, the ERT "sweep" was limited to spaces large enough to contain an individual, Pope Dep. 22–23:12, and thus was not more intrusive than necessary to address the claimed exigency.

By contrast, based on the facts known to the officers at the time, no reasonable officer could have believed that an exigency continued to exist as would justify a second warrantless break in of Corrigan's home to search for explosives. The evidence shows only that the MPD officers were presented with a potentially suicidal military veteran who possessed "military

items" and had IED training, but no information about actual or reported threats by him to others, much less that he had IED materials at home or would commit suicide in a manner that threatened others. *Cf. Mora*, 519 F.3d at 226. To reasonably conclude a second break in of Corrigan's home was necessary to resolve an imminently dangerous situation, the officers would have had to engage in conjecture that Corrigan, in his suicidal state, had intentionally set and hidden an explosive device in his home, or that he possessed an explosive device that he stored so negligently as to pose an imminent threat. To overcome the inferential chasm between the circumstances presented to the officers and the explosive consequences that the officers might have feared, the officers engaged in raw speculation unsupported by either precedent or the information they had. Based on that speculation, the EOD conducted "an exhaustive and intrusive search," *Mincey*, 437 U.S. at 389, that went far beyond a tailored search for explosives as to which the MPD had zero information.

The unfocused nature of the EOD search underscores its patent unreasonableness, both in terms of its scope and the lack of a reasonable basis for it. The most specific information relating to the posited explosives or "hazardous materials" that the MPD officers possessed was the ex-girlfriend's statement that Corrigan had a green duffel bag containing "military items." The initial protective "sweep" by the ERT revealed no sign of the green bag. *See* Barricade Rpt. 5. Yet rather than tailoring the EOD's search to that duffel bag, Officer Leone testified that the EOD was searching for "[h]azardous materials, anything that can be from an IED, which is an improvised explosive device, hand grenades, any kind of explosive materials," or "[c]omponents that make a bomb, explosive material, whether it be C4, black powder, TNT, wires, any kind of mechanical switches that can be used to create an improvised device." Leone Dep. 22:8–12; 23:7–10. Clearly established law foreclosed the broad and invasive search that was executed.

And even assuming, without deciding, that the community caretaking doctrine could justify the warrantless search of a home, it cannot shield the officers from liability. It is clearly established that this doctrine encompasses only police searches that are occasioned by, and strictly circumscribed by, the need to perform caretaking functions "totally divorced from the detection, investigation, or acquisition of evidence related to" a crime. *Cady*, 413 U.S. at 441. That is, the police must be lawfully inside a home for a reason unrelated to ferreting out crime. For example, in *Rohrig*, 98 F.3d at 1509, the Sixth Circuit held that the community caretaking doctrine justified the police's entry and discovery of marijuana plants in plain view where the officers had entered the defendant's home to respond to a noise complaint after they received no answer to their "knock[ing] and holler[ing]." In *Quezada*, 448 F.3d at 1006, the Eighth Circuit held the doctrine applied where a police officer entered a home after receiving no response to their knocks on the front door although lights were on in the house and the officer could hear the audio of a television set. In *York*, 895 F.2d at 1029–30, the Fifth Circuit held the doctrine applied where the police crossed the threshold of a home to wait while guests retrieved their belongings after being threatened by the home owner. Here, the MPD broke in Corrigan's home a second time looking for unspecified "hazardous materials" on the basis of speculative hunches drawn from the ex-girlfriend's statement about unidentified "military items" in a duffel bag. No reasonable officer could understand the EOD's warrantless search that occurred to be the sort of "*minor* government interference" that *Cady* condoned. *See Hawkins*, 113 A.3d at 222 (emphasis added).

Finally, the wide berth for reasonableness that the Supreme Court has accorded officers involved circumstances in which they must make split second judgments. *See, e.g.*, *Sheehan*, 135 S. Ct. 1765; *Stanton v. Sims*, 134 S. Ct. 3 (2013);

*Brosseau v. Haugen*, 543 U.S. 194 (2004). The Court acknowledged that "[t]he Fourth Amendment standard is reasonableness, and it is reasonable for police to move quickly if delay 'would gravely endanger their lives or the lives of others.'" *Sheehan*, 135 S. Ct. at 1775 (quoting *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 298–99 (1967)). In Corrigan's case, the MPD had more than five hours, between the Fifth District's officers' arrival on the scene and the MPD's first contact with Corrigan himself, to gather information about a possible threat and apply for a warrant upon probable cause. Yet without any information Corrigan had or was likely to have explosives in his basement apartment home in a row house where he often had overnight guests, the MPD ignored the facts they did know. The more intrusive EOD search was conducted after the ERT "sweep" revealed no injury to others or suspicious items in plain view. Corrigan had peacefully submitted to MPD custody. As such, this was not a case in which officers had to make a split-second decision that, judged with the benefit of hindsight, is revealed to be mistaken. *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014). Rather, this is a case in which officers disregarded the long-established "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton*, 445 U.S. at 586 (internal quotation marks omitted). They thereby contravened established law clearly putting them on fair notice that warrantless searches of a home based on an exception to the warrant requirement must be supported by a reasonable belief based on objective facts and narrowly circumscribed to the specific exigency claimed.

Our dissenting colleague parts company with our analysis only as to qualified immunity. As to that issue she acknowledges that "there can be 'an obvious case' where a more generalized test of a Fourth Amendment violation 'clearly establish[es]' the answer, even without a body of relevant case law" articulated at

a high level of specificity. Dis. Op. 7 (quoting *Brosseau*, 543 U.S. at 199). This is that "obvious case." A few clear propositions, all well established at the time of the search, admit of no relevant legal uncertainty in the context the EOD faced: The Fourth Amendment prohibits warrantless searches of a home, *see Payton*, 445 U.S. at 586, unless an exception to the warrant requirement applies, *see Welsh*, 466 U.S. at 749; the exigent circumstances exception requires "genuine exigency," *King*, 563 U.S. at 470; and the community caretaking exception, which no binding precedent has applied to the search of a home, is, in any event, limited to police functions that are "totally divorced" from criminal investigation, *Cady*, 413 U.S. at 441. As general as these propositions may be, their application here is straightforward, implicating no "hazy border" between acceptable and unacceptable conduct by trained law enforcement officers. Based on what they knew at the time, including what they learned during the initial "sweep" of Corrigan's home, the MPD officers lacked any reason to believe that Corrigan posed an exigent risk of harm to anyone. The officers' own conduct underscored the lack of exigency, waiting hours before they conducted the EOD search. Indeed, the dissent acknowledges that the circumstances the MPD officers faced at Corrigan's home, in contrast to those in which other courts have found exigency, "favored de-escalation." Dis. Op. 12.

Nevertheless, the dissent would ignore what the MPD's on-the-scene investigation revealed and afford qualified immunity based on facts as they existed when MPD officers first arrived, five hours earlier. *See* Dis. Op. 12–13. Numerous witnesses, including Officer Leone who led the EOD search, confirmed that if there was ever a gas smell, it had dissipated well before either search. The gas to the row house had been turned off upon MPD's arrival, *see* Barricade Rpt. 1, and no one reported smelling gas in the hours leading up to the EOD search, or during the ERT "sweep." Glover Dep. 38:15-21; Defs.' Resp.

to Pl.'s Statement of Material Facts at 14-15, 49. In other words, contrary to our colleague's suggestion, Dis. Op. 13, the MPD *had* "quell[ed] the initial concerns about a gas leak" by the time of the EOD search. In fact, the leader of the EOD search had not even been told of any concern about gas when he entered Corrigan's home. Leone Dep. 60:2-4. Nor was the EOD search in response to a potential suicide, for by that time Corrigan had peacefully surrendered and been removed from the scene. Lieutenant Glover acknowledged his belief, prior to the EOD search, that there were "guns or bombs or ammo" in Corrigan's home, Glover Dep. 45:4-11, and Officer Leone testified that the EOD search was intended to find "booby traps or explosive devices," Leone Dep. 19:1-4. Thus, our colleague's insistence that the EOD was "not investigating a crime" strains credulity. Dis. Op. 13.

Nothing in *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015), where the police were attempting to execute an arrest warrant, calls our conclusion into doubt. *See* Dis. Op. 4. The Supreme Court held there that the officers were entitled to qualified immunity where they used force against an imminent threat to public safety posed by a subsequent car chase where the object of the warrant was intoxicated and had twice threatened to shoot if the police followed him. 136 S. Ct. at 309, 310. Given the lack of any exigency in the instant case, *Mullenix*, like the entire run of recent cases granting qualified immunity, is relevant only insofar as it reinforces the familiar, objective immunity standard that we apply. *Id*. at 308-09; *see, e.g.*, *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (quoting *Ashcroft*, 563 U.S. at 735). Although qualified immunity may involve a lenient standard, *Mullenix*, 136 S. Ct. at 308, nothing in that case, nor in *Mora*, Dis. Op. 14, suggests that an immunity defense will succeed when officers ignore what they learn as their own investigation progresses.

To the extent Officers Pope and Leone maintain they are nonetheless entitled to qualified immunity because they reasonably relied on the directive of their superior, *see Elkins v. Dist. of Columbia*, 690 F.3d 554, 568 (D.C. Cir. 2012); *Liu v. Phillips*, 234 F.3d 55, 57 (1st Cir. 2000); *Bilida v. McCleod*, 211 F.3d 166, 175 (1st Cir. 2000), we remand this issue as to Officer Leone to the district court, where it was raised in supplemental briefing and contested by Corrigan in a supplemental opposition to summary judgment, but not reached by the district court.  In view of our conclusion that the officers involved in the initial ERT "sweep" are entitled to qualified immunity, Pope's further basis for immunity has become moot.

**III.**

Because the MPD's second search, by the EOD, violated Corrigan's Fourth Amendment rights, we remand Corrigan's claim of municipal liability against the District of Columbia, which the district court never reached.  Lacking a cause of action for vicarious liability for its officers' actions, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), Corrigan must prove that the District of Columbia was responsible for the violation, *see Doe v. Dist. of Columbia*, 796 F.3d 96, 105 (D.C. Cir. 2015), by showing that it had a custom, policy, or practice that caused the constitutional violation.  This is a fact-intensive inquiry that "the district court should address . . . in the first instance." *Id.* at 106.

Accordingly, we reverse the grant of summary judgment on Corrigan's Fourth Amendment claim and reverse in part on the officers' qualified immunity defenses, and remand the case for further proceedings.

BROWN, *Circuit Judge*, dissenting: As *Law and Order* reminds us every evening, the police are the ones "who investigate crime." Nowadays, though, we demand much more from them. The series of unfortunate events presented by Matthew Corrigan's lawsuit is distressing, and I agree with the conclusion that the second search of Corrigan's apartment violated the Fourth Amendment. Nevertheless, given the varied role played by police officers, and its effect on the standard Corrigan must meet to pierce the officers' qualified immunity, I respectfully dissent.

## I.

*The Varied Role of Police & the Virtue of Qualified Immunity*

"People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process." *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963) (per Burger, J.). "[B]y design or default, the police are also expected to reduce the opportunities for the commission of some crimes . . . , aid individuals who are in danger of physical harm, assist those who cannot care for themselves, resolve conflict, create and maintain a feeling of security in the community, and provide other services on an emergency basis." 3 Wayne R. LaFave, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 6.6 (5th ed.).

Maintaining the balance between protecting public safety and safeguarding individual constitutional rights has always been an exacting task. This charge is particularly challenging in our post–9/11 world, where even local police forces are increasingly confronted by sophisticated, well-armed threats, and where active-shooter scenarios are now part of routine training. Viewed in hindsight, Corrigan's recitation of the facts shows some poor judgment by the police, but we must consider what they knew and when they knew it. Had law

enforcement's initial response been less comprehensive, lives and property might have been lost when an explosion ripped the neighborhood apart, while the condemnations of law enforcement's lack of initiative would still be reverberating.

It is easy to criticize decisions made with less-than-perfect information in highly tense, rapidly-evolving situations. This is particularly true when officers are protecting an individual from potential dangers posed to himself or others, rather than serving in an investigatory or crime-fighting function. Accordingly, courts do not consider police conduct in response to "exigent circumstances" in the same way they evaluate police conduct in the context of criminal investigation. *See, e.g.*, *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 551 (7th Cir. 2014) ("Sutterfield, for example, frequently speaks about the lack of a warrant but has not addressed what type of warrant, if any, would have been appropriate and available in the circumstances confronting the police. Her briefs seem to view the case through the lens of criminal law enforcement when the case plainly does not fit that model.").

"A myriad of circumstances could fall within the terms 'exigent circumstances,'" and many could be ill-founded. *See Wayne*, 318 F.2d at 212. "Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found. Acting in response to reports of 'dead bodies,' the police may find the 'bodies' to be common drunks, diabetics in shock, or distressed cardiac patients." *Id.* This is why the qualified immunity standard appreciates that "the business of policemen . . . is *to act*, not to speculate or meditate on whether the report is correct." *See id.* (emphasis in original). The qualified immunity analysis requires courts to place themselves in the shoes of the law enforcement personnel

who confront these volatile situations, armed with little information and burdened with enormous responsibility.

Properly applied, the qualified immunity analysis shows the officers' initial actions were not only responsible, but commendable.  When the officers' actions transgressed the Fourth Amendment, Corrigan's rights were protected by the district court granting his motion to suppress and entering a *nolle prosequi* on all charges against him.  Now, when Corrigan seeks half-a-million dollars in a §1983 lawsuit, a different issue is in play:  whether controlling law was "sufficiently clear that *every* reasonable official would have understood that what [t]he[y] [did] violate[d]" Corrigan's Fourth Amendment rights. *See, e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (emphasis added).  The court concludes it was, but I am at a loss to understand how this holding can be squared with the simple fact that neither the Supreme Court's precedent, nor ours, nor a robust consensus of our sister circuits clearly answered the legal questions faced by the officers in this case.

There is much on which the majority and I agree.  Under the circumstances of this case, the first search was permissible; the second search was not; and the information the police garnered from the first search and further investigation changed the calculus.  However, on the question of how these issues impact the scope of qualified immunity, we part company.

First, by imposing an artificially high burden on police conduct in exigent circumstances, the court conflates the "probable cause" normally required to search a person's home and the "objectively reasonable basis" used to evaluate intrusions based on exigent circumstances. *Compare* Op. 12, 21–22 *with Brigham City, Utah v. Stewart*, 547 U.S. 398, 402,

407 (2006) (reversing the Utah Supreme Court's conclusion that probable cause and an inquiry into objective reasonableness were required to assess the justification of warrantless entry on the ground of exigent circumstances, relying solely on an analysis of objective reasonableness) *and United States v. Porter*, 594 F.3d 1251, 1258 (10th Cir. 2010) ("[T]he standard is more lenient than the probable cause standard") *and United States v. Snipe*, 515 F.3d 947, 952–53 (9th Cir. 2008). This conflation signals the majority opinion's fundamental flaw: grafting general Fourth Amendment standards from the criminal investigation context on to the exigency context.

Related to this first problem is the second—and more significant—issue with today's opinion: The metric for measuring what law is "clearly established" is more protean than my colleagues concede.

## II.

*"Clearly Established" Law*

*A. The Standard*

The standard for law to be "clearly established" is quite demanding. The Supreme Court's most recent pronouncement on the issue confirms "[a] clearly established right is one that is sufficiently clear that *every* reasonable official would have understood that what he is doing violates that right. We do not require a case directly on point, but *existing precedent* must have placed the statutory or constitutional question *beyond debate*. Put simply, qualified immunity protects all but the *plainly incompetent* or those who *knowingly violate* the law." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (*per curiam*) (emphasis added). Qualified

immunity is "a question of law, *not one of legal facts*." *Elder v. Holloway*, 510 U.S. 510, 516 (1994) (emphasis added). Indeed, *lower courts are not even under any obligation to address whether a constitutional right has been violated*; the court may proceed directly to whether any such right was "clearly established" in law at the time. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).[1]

## B. The Source

The source of "clearly established" law is quite constrained as well. Controlling precedent from the Supreme Court, the applicable state supreme court, or from the applicable circuit court, constitutes "clearly established" law—but it is unclear what else, if anything, does. *See, e.g.*, *Lane v. Franks*, 134 S. Ct. 2369, 2382 (2014) (observing that, if two prior Eleventh Circuit cases were still "controlling," the Court "would agree" the law is clearly established. But, "at best," there was "only a discrepancy in Eleventh Circuit precedent, which is insufficient to defeat the defense of qualified immunity"); *Stanton v. Sims*, 134 S. Ct. 3, 7 (2013) (*per curiam*) (emphasizing, in finding qualified immunity, that the questioned conduct was "lawful according to the courts in the jurisdiction where [defendants] acted"); *Hope v. Pelzer*, 536 U.S. 730, 741–42 (2002) (citing "binding Eleventh Circuit precedent," along with a State Department corrections regulation and a Justice Department report to hold Alabama prison officials violated clearly established law).

---

[1] Even so, I agree with the court's conclusion that the officers *did* violate Corrigan's Fourth Amendment rights during their second, intrusive search into his apartment. *See Pearson*, 555 U.S. at 236 (explaining "it is often beneficial" to analyze both issues, even as there is no requirement to do so).

If there is no controlling authority in the plaintiff's jurisdiction at the time of the incident, "a *robust* consensus of cases of persuasive authority" "is necessary" to show "clearly established" law. *al-Kidd*, 563 U.S. at 742 (emphasis added); *see also Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (requiring a *robust* consensus "at a minimum," absent controlling authority). This makes sense. It is simply not reasonable to ask police departments around the country to keep abreast of *every* circuit court's latest "clearly established" pronouncement and parse its application to the myriad factual permutations officers encounter on a daily basis. *Cf. Wilson v. Layne*, 526 U.S. 603, 618 (1999) ("If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy."). Accordingly, the Supreme Court is circumspect about the use of out-of-circuit cases to compose "clearly established" law. Since *al-Kidd*, *it is only assumed for sake of argument* that "a right can be 'clearly established' by circuit precedent despite disagreement in the courts of appeals." *See Taylor v. Barkes*, 135 S. Ct. 2042, 2045 (2015) (*per curiam*); *City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1776 (2015); *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (*per curiam*); *Reichle v. Howards*, 132 S. Ct. 2088, 2094 (2012).[2]

## *C. The Characterization*

Finally, characterizing the appropriate law as "clearly established" is quite exacting. The Supreme Court has "repeatedly told courts . . . not to define clearly established

---

[2] Indeed, two circuits go even further—*totally excluding* persuasive authority from other jurisdictions when determining what is "clearly established." *See Pabon v. Wright*, 459 F.3d 241, 255 (2d Cir. 2006); *Thomas* ex rel. *Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003).

law at a high level of generality. Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures." *Sheehan*, 135 S. Ct. at 1775–76. Rather, the law purported as "clearly established" must "provide clear notice" of what the Constitution requires. *See, e.g.*, *Lane*, 134 S. Ct. at 2382; *see also Sheehan*, 135 S. Ct. at 1777 ("No matter how carefully a reasonable officer read" the applicable circuit precedents "beforehand, that officer could not know that [the conduct at issue] would violate the Ninth Circuit's test"). To be sure, there can be "an obvious case" where a more generalized test of a Fourth Amendment violation "'clearly establish[es]' the answer, even without a body of relevant case law." *Brousseau v. Haugen*, 543 U.S. 194, 199 (2001). But, that circumstance is inapposite when a case is "one in which the result depends very much on the facts." *See id.* at 201. In that latter circumstance, a more "particularized" inquiry into the applicable law is required. *See id.* at 200. There, we ask whether a prior case "squarely governs the case here," *not* whether a prior case puts this one in a "hazy border" between acceptable and unacceptable conduct, *see id.* at 201. Behavior on the border is still behavior protected by qualified immunity.

### III.

*The Relevant Law Was Not "Clearly Established" Here*

The majority cites no Supreme Court case and no D.C. Circuit case squarely governing Corrigan's claim. Indeed, the majority all but concedes there is no such case when justifying its review of both the "constitutional violation" and "clearly established" prongs of the qualified immunity analysis; doing so "to avoid 'leav[ing] the standards of official conduct permanently in limbo.'" Op. 10 (quoting

*Camreta v. Greene*, 562 U.S. 692, 706 (2011)) (alterations in original).[3] The majority finds "clearly established" law by reasoning the facts of this exigent circumstances case back to the general principles of warrantless home searches in the criminal investigation context. This is inappropriate in Corrigan's case, where the officers were not searching for criminal activity but responding to a potentially-suicidal suspect with "military items." *See Sutterfield*, 751 F.3d at 563–64 ("But a more fundamental question raised by this case is the relevance of the warrant requirement. Certainly it is logical to consider the availability of a warrant when the police have reason to suspect that criminal activity may be afoot, but what about cases in which the police are not acting in a law enforcement capacity?"). But even if this was appropriate, the majority's analysis rests on "legal facts," not law. *But see Elder*, 510 U.S. at 516 ("Whether an asserted federal right was clearly established at a particular time . . . presents a question of law, not one of 'legal facts.'"). The facts aid the analysis, but only to the extent they are closely aligned (or are obviously distinguishable from) controlling authority or persuasive authority. The "clearly established" inquiry is its own question, not a rehash of the facts giving rise to a constitutional-rights violation. *Cf. Pearson*, 555 U.S.

---

[3] *Camreta* is illuminating towards the nature of qualified immunity and the "clearly established" standard. The discussion surrounding this quotation confirms the "clearly established" standard is akin to the "first bite rule" in torts. In other words, unless and until "[c]ourts . . . clarify uncertain questions, . . . address novel claims . . . [and] give guidance to officials about how to comply with legal requirements," qualified immunity is appropriate. *See Camreta*, 563 U.S. at 706. Accordingly, while I take no issue with the majority deciding *today* to define the scope of exigent circumstances in a warrantless home search during a barricade situation *on a go-forward basis*, applying it retroactively is another matter altogether.

at 236. The factual regurgitation is telling, however, because it confirms Corrigan's claim is one where the existence of "clearly established" law "depends very much on the facts of [this] case." *Brousseau*, 543 U.S. at 201. "Clearly established" law in this context thus depends upon a prior case "squarely govern[ing]" this one. *See id.* Since the majority can point to no clearly analogous case prohibiting the officers' conduct, that should end the inquiry.

The closest case cited, *Mora v. City of Gaithersburg*, 519 F.3d 216 (4th Cir. 2008), is not binding authority, and it confirms the officers' conduct fell within the "hazy border" between protected and unprotected conduct. It cannot, therefore, constitute a violation of "clearly established" law. *See Brousseau*, 543 U.S. at 201. In *Mora*, the Fourth Circuit held that officers reasonably conducted a warrantless search of the subject's bags, car, home, and effects even though he was outside the home and already handcuffed at the time. 519 F.3d at 226–27. Exigent circumstances existed in *Mora* because Maryland police had received a call from a healthcare hotline operator who said she had spoken to Mora; he told her he was suicidal, had weapons in his apartment, could understand shooting people at work, and he "might as well die at work." *See id.* at 220. Police promptly contacted a co-worker who confirmed Mora's threats should be taken seriously. *Id.* Eleven minutes after the operator's call, Mora was handcuffed and on the ground. *Id.* Without seeking a warrant, officers searched his vehicle and luggage, entered and searched his apartment, and opened two safes and multiple interior doors. The officers discovered multiple handguns and rifles, ammunition, and gun accessories. *Id.*

The Fourth Circuit rejected Mora's § 1983 suit claiming the searches violated the Fourth Amendment. The court emphasized "protecting the physical security of its people is

the first job of any government" and the threat of mass murder "implicates that interest in the most compelling way." *Id.* at 223. Given the issues at stake, the Fourth Circuit attempted to articulate a "framework for analyzing the constitutionality of preventive action" that is instructive here. *See id.* at 222.

*Mora* recognized "[p]reventive actions raise somewhat different constitutional questions than the typical backwards-looking criminal investigation or immediate police response to a crime already in motion. When the threat is [as] extreme and the need to prevent it [is] as great as with potential mass murder, the constitutional questions take on a special urgency and a certain novelty." *Id.* While "[t]he likelihood or probability that a crime will come to pass plays a role in other prevention-oriented cases," *id.* at 224, "so do two other factors," *id.*—namely, "how quickly the threatened crime might take place" and "the gravity of the potential crime." *Id.* "As the likelihood, urgency, and magnitude of a threat increase, so does the justification for and scope of police preventive action. In circumstances that suggest a grave threat and true emergency, law enforcement is entitled to take whatever preventative action is needed to defuse it." *Id.* at 224–25.

Here, as the district court said, the police were faced with "an admittedly unstable individual who had called a suicide hotline, admitted to having firearms, lied to investigators about his whereabouts, and was known to possess unknown military items." JA 634. Corrigan's neighbor had seen him previously host overnight guests, the police had spoken to Corrigan's ex-girlfriend on the phone but lacked a visual confirmation of her location, and the police smelled gas coming from his building upon their arrival. The police were also informed Corrigan had IED training. Like Mora,

Corrigan's intentions on the phone were "ambiguous to be sure." *See* 519 F.3d at 226. But the Fourth Circuit did not simply say officers had some justification to "rush[] immediately into Mora's home and tak[e] him into custody"—it said the officers had "*overwhelming* justification." *See id.* (emphasis added). Here, the officers admittedly had less-than-overwhelming justification for their initial search, but Corrigan's phone call and the corroborating information the officers learned provided ample justification for their initial search. Moreover, *Mora* was a case that implicated the criminal activity of mass murder, bringing that case closer to the more general Fourth Amendment rules of criminal investigation than Corrigan's case, which falls squarely into the exigency camp. Given the Fourth Circuit's analysis, if a sufficiently imminent and grave threat could justify a comprehensive warrantless search after the suicidal suspect's apprehension, an officer in a full-blown barricade situation could reasonably believe similarly expansive powers may be exercised lawfully here. Perhaps most importantly, the majority can cite to no case from the Supreme Court, our circuit, or "a robust consensus of cases of persuasive authority" requiring a contrary conclusion. *See Plumhoff*, 134 S. Ct. at 2023; *see also Doe v. District of Columbia*, 796 F.3d 96, 105 (D.C. Cir. 2015) ("Given the uncertainty regarding when exactly an exigency exists and the lack of our own controlling precedent, the law in question was not 'clearly established' at the time.").[4]

---

[4] As the majority admits, nothing in our existing precedent determines the community-caretaking doctrine's contours in a home intrusion, *see* Op. 19–21, but the court then "assum[es] without deciding" it applies here and it nevertheless has "clearly established" contours, *see id.* at 20. I fail to see how: (1) *conceding* there is no controlling authority; (2) *assuming* without deciding there is applicable authority by reading the tea leaves from "some circuits"; *and then* (3) *concluding* that these cases constitute

To be sure, the facts here provide some contrast to *Mora*. In the initial sweep of Corrigan's home, police did not find any dangerous or illegal items in plain view, or incendiary written materials, or locked doors.  Interviews with neighbors who seem to know him well were reassuring rather than alarming.   His upstairs neighbor explained Corrigan's unresponsiveness was probably the result of having taken his medication; he was likely sleeping.  She dismissed the news that Corrigan was suicidal as "outrageous" and told officers there must be "a big misunderstanding" because, in two years of contact with Corrigan, she had "never felt more comfortable" with a neighbor.  Thus, just as facts learned about Mora gave officers reason to ratchet up preventive actions, the investigation into Corrigan's background favored de-escalation.

Nevertheless, the majority fails to appreciate the three crucial imports from *Mora*:

*First*, the case gives officers a rational basis to conclude that they may, under the right circumstances, conduct a warrantless search of a suicidal suspect's residence even after the suspect has been apprehended.  *But see* Op. 15.  This is what occurred here, where Lt. Glover sent the EOD into Corrigan's apartment to search for any hazardous materials that could pose a threat to others—though the officers were

---

a "robust consensus" at the time the officers entered Corrigan's apartment places the "constitutional question" over the community-caretaking doctrine's contours in the home "beyond debate."  *See Mullenix*, 136 S. Ct. at 308; *cf. Wilson*, 526 U.S. at 617–18 (characterizing a circuit split on the relevant issue as "undeveloped," meaning "the officers in this case cannot have been expected to predict the future course of constitutional law").

uncertain about what they may find and their intuitions were unfounded.

*Second*, when deciding to execute subsequent searches in the exigency context, the officers can "take into account the nature of the threat *that led to their presence at the scene*." *Mora*, 519 F.3d at 228 (emphasis added). In other words, the initial justification for a warrantless search can continue to play a role in how an officer proceeds when subsequently "uncovering the threat's scope." *See id.* at 226; *see also Sutterfield*, 751 F.3d at 567–68. Just so here, where, as Lt. Glover said, if the officers left it to Corrigan's landlady to return upstairs without quelling the initial concerns about a gas leak and possible military equipment, the police would be responsible for the consequences. For this reason, much of the majority's hand-wringing about the officers' failure to obtain a warrant for the second search is beside the point. The officers here were responding to an exigent circumstance involving a suicide suspect with IED training in the middle of the night; they were not investigating a crime. *Cf. United States v. Hendrix*, 595 F.2d 883, 886 (D.C. Cir. 1979) ("Because of the early hour, it would have taken at least a few hours to obtain a warrant, during which period appellant, who had been arrested merely for disorderly conduct, likely would have been able to secure his release, return home, and conceal or use the shotgun again."). A reasonable officer might conclude that "the mere passage of time without apparent incident" is insufficient to alleviate the initial concerns giving rise to the exigency. *See Sutterfield*, 751 F.3d at 562.

*Third*, in both Mora's case and Corrigan's, the malleable legal standard to determine the scope of the exigency they faced (that, in turn, determines the scope of an acceptable search) was crafted *in hindsight*—it could not be deemed "clearly established" at the time the officers took action, yet it

must be in order to defeat qualified immunity. At the time—with no Supreme Court or D.C. Circuit case squarely governing the emergency situation faced here—a reasonable officer could read *Mora*, *Sutterfield*, and *Hendrix* and conclude that the warrantless searches conducted in Corrigan's apartment might be within the realm of the officer's authority to abate public safety concerns posed by possession of military equipment by an individual with IED training. This is so even as the second search was a "substantial step beyond the standard protective sweep." *See Sutterfield*, 751 F.3d at 577.

Unlike the general principles of Fourth Amendment law the majority recites from the criminal investigation context, "courts have not spelled out a definition of 'exigency' with any precision." *See United States v. Dawkins*, 17 F.3d 399, 405 (D.C. Cir. 1994); *see also Sutterfield*, 731 F.3d at 553 n.5 (recognizing "the lack of clarity in judicial articulation and application" of the exigent circumstance doctrines). But determining whether the law was "clearly established" is not an exercise in Monday-morning quarterbacking—law enforcement officers should not be subject to personal liability simply because the judiciary has not precisely defined the rules of the road. *See Pitt v. District of Columbia*, 491 F. 3d 494, 512 (D.C. Cir. 2007) ("Although [the conduct can constitute a violation of the Fourth Amendment], the district court correctly held that the three defendant officers are entitled to qualified immunity on these claims because *this right was not 'clearly established' at the time of the actions at issue in this case*.") (emphasis added). It is therefore insufficient to apply, retrospectively, criminal investigation limitations on police conduct to the exigent circumstances context simply because these limitations have long existed in the investigatory context.

Ultimately, the court's analysis rests on the "Fourth Amendment standard" of reasonableness. *See* Op. 24–27. The "inquiry" of "objective reasonableness" as to a Fourth Amendment violation, however, "is not as forgiving as the one employed in the distinct context of deciding whether an officer is entitled to qualified immunity for a constitutional or statutory violation." *See Heien v. North Carolina*, 135 S. Ct. 530, 539 (2014). The fact that the officers violated the Fourth Amendment in searching Corrigan's apartment a second time without a warrant is, for purposes of finding the "particular" issue faced by the officers answered by "clearly established" law, a *non sequitur*. What "every reasonable" official would have understood to be "clearly established" in case law is not the same question as what is "objectively reasonable" for purposes of determining a Fourth Amendment violation. *See Heien*, 135 S. Ct. at 539–40; *cf. Pearson*, 555 U.S. at 236 (holding that lower courts are under no obligation to consider *both* the issue of a constitutional-rights violation and the separate question of whether the right was clearly established). Moreover, the fact-based analysis of what law was "clearly established" here—spanning roughly six pages of the majority's opinion, *see* Op. 21–27—precludes the majority from credibly resting the "clearly established" question on a "basic principle of Fourth Amendment law," *see id.* at 25. It does not take six pages to explain why law is "clearly established" unless the case is "one in which the result depends very much on the facts." *Brousseau*, 543 U.S. at 199, 201. Identifying "some tests [from cases] to guide us in determining the law in many different kinds of circumstances" is not the same as articulating "the kind of clear law (*clear answers*) that would apply with such obvious clarity to the circumstances of this case that only an incompetent officer or one intending to violate the law could possibly fail to know . . . ." *Pace v. Capobianco*, 283 F.3d 1275, 1283 (11th Cir. 2002) (emphasis added). But the

majority will not—and indeed, cannot—admit this. If the majority did admit this, it would then have to concede no case "squarely governed" at the time the officers entered Corrigan's apartment.

## IV.

We do not need to make "bad law" just because "bad facts" are often accused of doing so. There is much to regret about the procedures police continued to pursue here—especially in light of the many observations and revelations which objectively decreased the imminence of any dire threat. Good intentions, however, are no substitute for good reasons. "Because of the importance of qualified immunity to society as a whole, the [Supreme] Court often corrects lower courts when they wrongly subject individual officers to liability." *Sheehan*, 135 S. Ct. at 1774 n.3. *Indeed, if this decision were affirmed by the Supreme Court on the ground that the officers violated clearly established law, it would mark the first time in more than a decade that the Supreme Court has ruled in favor of a § 1983 plaintiff on the question. See Groh v. Ramirez*, 540 U.S. 551, 565 (2004); *Hope*, 536 U.S. at 745–46. Yet the Supreme Court's exacting standard to identify "clearly established" law does not play even a supporting role in the court's analysis, which, at most, strings together generalized statements and some out-of-circuit cases, affixes the label "clearly established" onto the newfangled "rule" drawn from them, and then employs this "rule" to deny qualified immunity. If we want to join the game of second-guessing first responders, we will find ourselves at the end of a long queue. But flouting the clear trend of controlling authority is both unwarranted and unwise, so I respectfully dissent.