Rule 23 order filed
October 18, 2016;
Motion to publish granted
January 5, 2017.

2017 IL App (5th) 150244

NO. 5-15-0244

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Marion County. |
| | ) | |
| v. | ) | No. 15-DT-03 |
| | ) | |
| CHRISTOPHER BIAGI, | ) | Honorable |
| | ) | Mark W. Stedelin, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE MOORE delivered the judgment of the court, with opinion.
Justice Chapman concurred in the judgment and opinion.
Justice Welch dissented, with opinion.

**OPINION**

¶ 1    The plaintiff, the People of the State of Illinois (State), appeals the April 13, 2015, order of the circuit court of Marion County that granted the motion of the defendant, Christopher Biagi, to suppress evidence and granted his petition to rescind the statutory summary suspension (SSS) of his driver's license. For the following reasons, we reverse.

¶ 2                                    FACTS

¶ 3    On January 3, 2015, the defendant received a citation for driving under the influence, pursuant to section 11-501 of the Illinois Vehicle Code (625 ILCS 5/11-501 (West 2014)). A confirmation of the SSS of the defendant's driving privileges was entered in the circuit court

1

on January 28, 2015. The defendant filed a petition to rescind the SSS and a motion to suppress evidence on February 6, 2015, and February 24, 2015, respectively.

¶ 4 A hearing was conducted on April 1, 2015. Seth Williams testified that he is employed as a trooper with the Illinois State Police and has been so employed for over six years. Besides basic field sobriety training, Williams completed Advanced Roadside Impairment Driving Enforcement, a training to execute field sobriety testing, to recognize the indicators of drug impairment, and to learn about different types of drugs and the correlating impairment that may be shown when those drugs are used. Williams estimated that he had conducted approximately 50 stops that involved drug impairment with no alcohol involved.

¶ 5 Williams recalled that on January 3, 2015, at 12:44 a.m., he was on duty and patrolling Red Stripe Road, which is covered with oil and chip and has no lane markings. Williams testified that while traveling eastbound, he noticed a vehicle ahead of him that was traveling the same direction. He noted that there were no other vehicles on the road other than his and the one in question. Williams stated that the speed limit on Red Stripe Road is 55 miles per hour and the subject vehicle was traveling 32 miles per hour.

¶ 6 Williams testified that he did not activate his headlights to initiate a stop, but the vehicle ahead of him continued to decrease its speed, partially pulled onto the shoulder, and came to a stop at the top of a hill. Williams explained that the shoulder along Red Stripe Road is "pretty much nonexistent" and because the subject vehicle was large, it was parked on the shoulder only two or three feet, and the rest of it extended into the roadway. Williams's first inclination was to pass the vehicle, but he realized that he was approaching

2

the defendant's vehicle at the top of the hill and would be unable to see any westbound traffic on the other side of the hill. He indicated that there were two driveways at the top of the hill, either of which the driver could have pulled into but did not.

¶ 7    Williams then surmised that the driver–who was later discovered to be the defendant–must be having car trouble because of the slow speed and because "nobody would stop at the top of the hill like that." Accordingly, Williams notified dispatch that he was conducting a motorist assist, pulled in and parked behind the vehicle, activated his takedown lights to illuminate the area in front of him, and activated his rear-facing emergency lights to divert any traffic that may approach from behind. Williams explained that the takedown lights are bright LED lights–also known as fog lights–that point to the front and light up a large span of area. He indicated that he used them only so he could see as he approached the vehicle and that the defendant was free to pull away and leave up to the time when he made contact with him.

¶ 8    Williams testified that he approached the defendant and asked him what was wrong. The defendant replied, "Good afternoon," and handed Williams his driver's license and insurance card. Williams indicated that he found the defendant's statement extremely odd, given the time was 12:44 a.m. and it was unmistakably dark outside. Williams noted that the defendant's speech was slow, he appeared slumped in his seat, and his movements were "extremely slow and delayed for an appropriate individual." He also noticed that the defendant's "pants were unbuttoned about half way down his thighs," which he also found very unusual. Williams testified that at that point, he no longer deemed the situation a

3

"motorist assist," but now saw it as a traffic stop under investigation for driving under the influence of some form of drugs, as there was no detectable smell of alcohol.

¶ 9    Williams testified that the defendant informed him that he and his passenger were just out driving around and he had pulled over because "he didn't want to be pushed," meaning that he was traveling slower than Williams and he wanted to get out of the way. Williams testified that the defendant already had his driver's license out and offered it to Williams, who returned to his squad car with the driver's license. After confirming the validity of the license, Williams returned and asked the defendant to step out of the vehicle. He also obtained identification from the defendant's passenger, who turned out to be the defendant's wife. Williams testified that as the defendant stepped out of the vehicle, his movements were slow and methodical. Meanwhile, an assisting officer arrived on the scene, and Williams moved his car to the front of the defendant's vehicle because he needed a flat surface to conduct field sobriety tests.

¶ 10    Prior to administering a horizontal gaze nystagmus test, Williams shined his flashlight on the defendant's face. Upon doing so, Williams noticed the defendant's pupils were dilated. Williams explained that normal pupil range in darkness is six millimeters or less and he quickly noticed that the defendant's pupils were much larger than that, an estimated seven to seven-and-a-half millimeters. Williams added that the defendant's pupils did not change when the flashlight was shined in his face, but remained dilated. Williams asked the defendant if he had consumed any form of illegal narcotics or prescription medication, and the defendant replied that he had not. Notwithstanding the defendant's response, at the

4

conclusion of the field sobriety tests, Williams believed that he was under the influence of something.

¶ 11     In addition to the horizontal gaze nystagmus test, the defendant performed the walk-and-turn and the one-leg stand, his performance on both of which Williams described as "extremely bad." Williams asked the defendant's wife if the defendant had consumed any form of narcotic or prescription medication, and she stated that he had not, but that he had "been up for quite a while and was tired." Williams in turn asked the defendant about being tired and the defendant responded that he had been awake since New Year's Eve, which was approximately 48 hours prior. The defendant added that "I stay up for long periods and then I relax." The defendant's statement alerted Williams to the possibility of amphetamine abuse, with which Williams is quite familiar.

¶ 12     Williams testified that he arrested the defendant for driving under the influence based on his observations of the defendant and the defendant's performance of the field sobriety tests. Williams then searched the defendant incident to arrest and found an orange, 20 milligram amphetamine salt pill in the defendant's front pocket. He also found two other pills that he was unable to identify.

¶ 13     Andrew Smith testified that he is employed as a trooper with the Illinois State Police and has been so employed for four years. Smith was on duty and patrolling in Marion County on January 3, 2015. At approximately 12:50 a.m., Smith was dispatched to the scene to assist Williams. He confirmed that when he arrived, the defendant and Williams were parked on a hill and the defendant had already stepped out of his vehicle and was talking to Williams. Smith noticed that the defendant "seemed to be having a hard time focusing on

5

the directions that Trooper Williams was instructing him on. Almost as if he was struggling for him to focus [*sic*]." Smith explained that "he almost had a sense of being paranoid with quick movements of the head and looking around, eyes darting back and forth." Like Williams, Smith did not smell any alcohol on the defendant. Smith testified that he had completed standard field sobriety test training as well as advanced impaired driver enforcement, which involves DUI drug enforcement. Smith concluded that the defendant was under the influence of something, based on the fact that his ability to comprehend instructions was "definitely out of the ordinary."

¶ 14    At the close of evidence, the circuit court took the matter under advisement and entered an order on April 13, 2015, that granted both the motion to suppress evidence and the petition to rescind the SSS. The State filed a motion to reconsider on May 13, 2015, which the circuit court denied on June 17, 2015, following a hearing. The State filed a notice of appeal on June 17, 2015, and filed a certificate of impairment on June 18, 2015. Additional facts will be added as necessary in our analysis of the issues.

¶ 15                                    ANALYSIS

¶ 16    The State raises the following issues on appeal: (1) whether the circuit court erred by granting the defendant's motion to suppress evidence and (2) whether the circuit court erred by granting the defendant's petition to rescind the SSS of his driver's license.

¶ 17                        I. Motion to Suppress Evidence

¶ 18                        A. *Standard of Review*

¶ 19    "In reviewing a trial court's ruling on a motion to suppress evidence, we apply the two-part standard of review adopted by the Supreme Court in *Ornelas v. United States*

6

[citation]." *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). "[W]e give great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence." *Id.* "A reviewing court, however, remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding what relief should be granted." *Id.* "Accordingly, we review *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted." *Id.*

¶ 20                              B. *State's Concession in the Circuit Court*

¶ 21     As a threshold matter, we note that the State acknowledged in its opening brief that it conceded in its motion to reconsider that the interaction between Williams and the defendant was not a consensual encounter, but a community caretaking stop. The State additionally conceded that Williams's activation of the steady white lights on his patrol car was a seizure. Notwithstanding these concessions in the circuit court, the State now argues on appeal that the interaction between Williams and the defendant was consensual and not a detention at all, thereby rendering inapplicable any fourth amendment implications.

¶ 22     The defendant argues that the State is estopped from asserting this argument on appeal because of the concessions it made below. We reject this argument because a reviewing court is not bound by a party's concession. See *People v. Horrell*, 235 Ill. 2d 235, 241 (2009). Accordingly, we choose to address the State's consensual encounter argument.

¶ 23                              C. *Consensual Encounter*

¶ 24     The State argues that the circuit court erred when it granted the defendant's motion to suppress evidence because the encounter between Trooper Williams and the defendant was consensual and not a seizure, thereby rendering inapplicable any fourth amendment

7

implications. "The fourth amendment to the United States Constitution guarantees the 'right of the people to be secure in their persons, houses, papers, and effects, and against unreasonable searches and seizures.' " *People v. Gherna*, 203 Ill. 2d 165, 176 (2003) (quoting U.S. Const., amend. IV). "The burden of proving the unlawfulness of a search and seizure on a motion to suppress rests with [the] defendant." *People v. Clark*, 394 Ill. App. 3d 344, 347 (2009).

¶ 25   "It is well settled that not every encounter between the police and a private citizen results in a seizure." *Luedemann*, 222 Ill. 2d at 544. "Courts have divided police-citizen encounters into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative detentions, or '*Terry* stops,' which must be supported by a reasonable, articulable suspicion of criminal activity; and (3) encounters that involve no coercion or detention and thus do not implicate fourth amendment interests." *Id*. "Third-tier encounters are also known as consensual encounters." *Id*.

¶ 26   "For purposes of the fourth amendment, an individual is 'seized' when an officer 'by means of physical force or show of authority, has in some way restrained the liberty of a citizen.' " (Internal quotation marks omitted.) *Id*. at 550 (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). "[T]he law clearly provides that a police officer does not violate the fourth amendment merely by approaching a person in public to ask questions if the person is willing to listen." *Id*. at 549. "Indeed, the Supreme Court has stated expressly that the police have the right to approach citizens and ask potentially incriminating questions." *Id*. Taken a step further, "the police may do *more* than merely ask questions without turning the encounter into a seizure." (Emphasis added.) *Id*. at 551. " '[E]ven when officers have no

8

basis for suspecting a particular individual, they may generally ask questions of that individual [citations]; ask to examine the individual's identification [citations]; and request consent to search his or her luggage [citations]–as long as the police do not convey a message that compliance with their requests is required.' " *Id*. (quoting *Bostick*, 501 U.S. at 434-35). "The encounter becomes a seizure only if the officer, through physical force or a show of authority, restrains the liberty of the vehicle's occupant." *Id*. at 552-53.

¶ 27    "[T]he appropriate test is whether a reasonable person in [the] defendant's position would have believed he was free to decline [the officer's] requests or otherwise terminate the encounter." *Id*. at 551. "Moreover, the test presupposes a reasonable *innocent* person." (Emphasis in original.) *Id*. "The analysis requires an objective evaluation of the police conduct in question and does not hinge upon the subjective perception of the person involved." *Id*.

¶ 28    Here, the circuit court found that "the trooper activated his 'take down' lights, being white lights to illuminate the area, and exited his vehicle. These [a]ctions would be seen by the [d]efendant as a command to stay put. Therefore, [the] [d]efendant was detained by the trooper." The defendant argues that the circuit court's ruling should be affirmed because a reasonable person in these circumstances would not have felt free to leave. We disagree because this argument and the findings of the circuit court directly contradict established case law.

¶ 29    In *People v. Luedemann*, the Illinois Supreme Court held that shining a light on a vehicle is not a seizure where there is no coercion or a threat of coercion present. 222 Ill. 2d at 561. The defendant attempts to distinguish *Luedemann* on the basis that the police officer

9

there used a flashlight, while in this case Williams used not only a flashlight, but also activated the takedown lights to illuminate the area prior to approaching the defendant. We find this distinction is of no consequence because *Luedemann* uses the terms "flashlight" and "spotlight" synonymously. The *Luedemann* court reasoned: "If we adopted the \*\*\* view that the use of a flashlight is inherently coercive and analogous to a tone of voice indicating that compliance is compelled, that would make a seizure of any nighttime encounter in which an officer uses a flashlight *or spotlight*." (Emphasis added.) 222 Ill. 2d at 563. The *Luedemann* court further observed that the officer would be left "with a dilemma that we are not prepared to require: 'an officer is not constitutionally required to choose between a consensual encounter in the dark or turning on a *spotlight* and thereby effectuating a detention that may not be supported by reasonable suspicion.' " (Emphasis added and internal quotation marks omitted.) *Id*. (quoting *State v. Baker*, 107 P.3d 1214, 1218 (Idaho 2004)). Accordingly, Williams's use of the flashlight and takedown lights did not constitute a seizure of the defendant without the presence of some form of coercion. See *id*. at 561.

¶ 30    In determining whether coercion is present–thereby resulting in a seizure–courts examine the following factors, which were established by the United States Supreme Court in *United States v. Mendenhall*, 446 U.S. 544, 554 (1980): "(1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Luedemann*, 222 Ill. 2d at 553.

¶ 31    The *Mendenhall* factors "are not exhaustive and \*\*\* a seizure can be found on the basis of other coercive police behavior that is similar." *Id*. at 557. For example, *Luedemann*

10

observed that the officer in that case did not block the defendant's parked vehicle, did not use flashing lights as a show of authority, and did not order the defendant to place his hands on the steering wheel. *Id.* at 557-58. It was only after the officer observed signs that the defendant was under the influence that a reasonable, articulable suspicion was provided for the subsequent seizure. *Id*. at 565-66.

¶ 32 Here, although the defendant references the *Mendenhall* factors in his brief, he contends that he was seized because any reasonable person in his position would not have felt free to drive away because of Williams's "physical maneuvers and show of authority." In support of his argument, the defendant cites the following facts: Williams was in a marked squad car, approached the defendant's vehicle from behind, and quickly closed the distance between them; when the defendant pulled over to allow Williams to pass, Williams pulled in behind him; Williams activated his takedown lights and rear emergency lights; Williams exited his vehicle in full uniform with a visible weapon and his flashlight drawn; and Williams approached the defendant's vehicle from the street side, reached out to touch the vehicle with his right hand, then came to rest both arms on the driver's door and leaned toward the vehicle. The defendant argues that these actions constituted a show of authority sufficient to convince any reasonable person that he or she was not free to leave or disregard Williams. We find this argument problematic because none of these facts point to coercive behavior as set forth in *Mendenhall* and *Luedemann*.

¶ 33 A review of the video in the record reveals no other officers present, no display of a weapon by Williams, no physical touching of the defendant's person by Williams, and no language or tone of voice by Williams to indicate that compliance with Williams's request

11

was compelled. Regarding the *Mendenhall* factors, there must be *some* such evidence; otherwise, any inoffensive contact between a citizen and a police officer cannot, as a matter of law, constitute a seizure of the citizen. See *Luedemann*, 222 Ill. 2d at 554. Moreover, Williams did not block the defendant's vehicle, did not use flashing lights as a show of authority, and did not order the defendant to place his hands on the steering wheel. See *id.* at 557-58.

¶ 34    The defendant attempts to distinguish *Luedemann* because this case does not involve a "parked vehicle." He states in his brief that he "did not intend to park; he merely intended to pull over momentarily to allow Williams to pass" and this was clear "from his statement to Williams that he pulled over to get out of his way." This argument has no impact on the applicability of *Luedemann* because there is no requirement that a vehicle must be parked before being observed by the officer. Furthermore, there is no way Williams could have possibly discerned the defendant's intent as he witnessed the defendant voluntarily pull over, stop, and park his vehicle.

¶ 35    Next, the defendant contends that it was Williams's rate of speed that caused the defendant to stop. Again, he cites no authority that a particular rate of speed would exclude the applicability of *Luedemann* to this case. Moreover, the evidence shows that Williams was driving at an appropriate rate of speed. The speed limit was 55 miles per hour, and the defendant was driving 32 miles per hour. These facts indicate that it was the *defendant's* rate of speed–not Williams's–that caused the distance between the two vehicles to rapidly narrow before the defendant pulled over.

¶ 36 The defendant also argues that the road conditions on the night in question made Williams's speed unreasonable and caused the defendant to stop. He states in his brief that it was a rainy winter night, the road was unlit and unmarked with no posted speed limit, and "the pavement itself had patchy coloration–*potentially* obscuring ice or pooling water." (Emphasis added.) Again, the defendant cites no authority to support his argument that any of these facts–one of which is entirely speculative–would have any bearing on the applicability of *Luedemann* to this case. Moreover, we will not entertain any suggestion with no supporting evidence in the record. However, even assuming, *arguendo*, that the road conditions were relevant, the video in the record shows, at most, a very light drizzle, Williams had his windshield wipers on a slow, intermittent setting, and there is no evidence in the record to show that the road was in any way slick or hazardous that night. For these reasons, we reject the defendant's argument regarding the road conditions.

¶ 37 In summary, there was no coercive behavior by Williams, nor any threat thereof, nor was there any physical force or show of authority to restrain the defendant's liberty. See *Luedemann*, 222 Ill. 2d at 554-58. For these reasons, we find the encounter between the defendant and Williams–prior to Williams's observation of signs that the defendant was under the influence–was consensual and not a seizure, thereby rendering inapplicable any fourth amendment implications. As a result, the circuit court erred by finding that a seizure had occurred and by granting the defendant's motion to suppress evidence on that basis. Accordingly, we reverse the portion of the circuit court's order that granted the defendant's motion to suppress.

¶ 38                    D. *Community Caretaking Doctrine*

¶ 39    Even if, *arguendo*, we were to exclude the consensual encounter argument because of the concession the State made in the circuit court, the ultimate outcome is still the same under the State's alternative argument because any assumed seizure was reasonable under the community caretaking doctrine.  The United States Supreme Court established that "local law enforcement officers 'frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.' "  *People v. McDonough*, 239 Ill. 2d 260, 269 (2010) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)).  "[T]he community caretaking doctrine 'is analytically distinct from consensual encounters and is invoked to validate a search or seizure as reasonable under the fourth amendment.' "  *Id.* at 270 (quoting *Luedemann*, 222 Ill. 2d at 548).  " '*It is not relevant to determining whether police conduct amounted to a seizure in the first place.*' "  (Emphasis in original.)  *Id.* (quoting *Luedemann*, 222 Ill. 2d at 548).

¶ 40    The *McDonough* court recognized the following challenge in applying the community caretaking doctrine:

> " 'Most people who appear to be in distress would welcome a genuine offer of police assistance.  But permitting police to search or seize whenever they might be pursuing community-caretaking goals risks undermining constitutional protections.  The challenge of [the] community-caretaking doctrine is to permit helpful police to fulfill their function of assisting the public, while ensuring that searches for law-

enforcement purposes satisfy the requirements of the Fourth Amendment.' " *Id.* at 272 (quoting Michael R. Dimino, *Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness*, 66 Wash. & Lee L. Rev. 1485, 1562-63 (2009)).

¶ 41 There are "two general criteria a court must find in determining whether the community caretaker exception applies." *Id.* "First, law enforcement officers must be performing some function other than the investigation of a crime." *Id.* "In making this determination, a court views the officer's actions *objectively*." (Emphasis added.) *Id.* "Second, the search or seizure must be reasonable because it was undertaken to protect the safety of the general public." *Id.* " 'Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances.' " *Id.* (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). "The court must balance a citizen's interest in going about his *** business free from police interference against the public's interest in having police officers perform services in addition to strictly law enforcement." *Id.* Community caretaking tasks include but are not limited to "helping children find their parents, mediating noise disputes, responding to calls about missing persons or sick neighbors, *** helping inebriates find their way home" (*id*. at 269), or approaching a vehicle that is pulled over on the side of the road to offer assistance. *Id*. at 273.

¶ 42 We find the facts in *People v. McDonough* similar to those in the instant case. In *McDonough*, the defendant's vehicle was pulled over on the shoulder of a highway at night and the officer approached the vehicle to offer assistance. *Id*. The court found the assumed

seizure reasonable because it was undertaken to protect the safety of the public. *Id.* *McDonough* recognized that "[t]he public has a substantial interest in ensuring that police offer assistance to motorists who may be stranded on the side of a highway, especially after dark and in areas where assistance may not be close at hand." *Id*. Moreover, an "officer has the right to make a reasonable investigation of vehicles parked along roadways to offer such assistance as might be needed and to inquire into the physical condition of persons in vehicles" because "[t]he occupant of a parked vehicle may be intoxicated, suffering from sudden illness, or may be only asleep." *Id*. The court held that, under such circumstances, "it is within a responsible law enforcement officer's authority to determine whether assistance is needed." *Id*.

¶ 43   Applying these principles to the case at bar, we find that any alleged seizure was reasonable under the community caretaking doctrine and resulted in no fourth amendment violation. The defendant argues that the alleged seizure was not justified by the community caretaking doctrine because it was readily apparent that the defendant stopped his car to allow Williams to pass and not because of any car trouble or distress. We disagree.

¶ 44   The defendant cites no authority to support the argument that an officer must observe an obvious need for help before initiating a safety check on the driver of a vehicle parked along the side of the road. Even assuming, *arguendo*, that any distress was a relevant factor, Williams could have reasonably concluded that the defendant was experiencing distress. The fact that the defendant was driving 20 miles per hour under the speed limit could by itself indicate the possibility of mechanical failure or physical illness. Accordingly, we reject the defendant's argument that it was affirmatively shown that no danger or distress existed.

16

¶ 45    In applying the actual established law to the fact of this case, first, the evidence shows that Trooper Williams was performing a function other than the investigation of a crime. See *McDonough*, 239 Ill. 2d at 272. Williams testified that the defendant was traveling over 20 miles per hour under the speed limit. As shown on the video in the record, Williams was forced to slow and stop as the defendant slowed and stopped in front of him. The defendant parked on the shoulder of a rural road in the middle of the night. The road was poorly lit and sparsely populated. These facts could prompt any reasonable police officer to have genuine concern for the welfare of the defendant. See *id.* at 273. Williams parked behind the defendant and notified dispatch that he was conducting a motorist assist. There is no evidence to indicate that he was doing otherwise, and the totality of the circumstances supports the reasonableness of Williams's decision to check on the welfare of the defendant. See *id*.

¶ 46    Second, we find that Williams's actions were undertaken to protect the safety of the general public. See *id.* at 272. As stated, the defendant was traveling more than 20 miles per hour under the speed limit and the road was dark with no lane markings. Williams indicated–and the video confirms–that the defendant came to a stop at the top of a hill and Williams was unable to see any traffic that may be approaching from the opposite side. It was not until Williams pulled right up behind the defendant and came to a stop that any portion of the road on the opposite side of the hill became visible. Even then, the only visible portion was a stretch of flat road beyond the hill and not the road on the opposite side of the hill itself. Anyone desiring to drive around the defendant would have been required to

17

cross over into the opposite lane before any oncoming traffic would have been visible, thereby posing a traffic risk and a public safety hazard.

¶ 47   The circuit court stated in its order that "it was clear from the video that the trooper had sufficient room and vision to pass safely."  Our review of the video, as described in detail above, shows otherwise.  However, notwithstanding the location of the vehicle and the visibility of the road, the mere possibility of the defendant being stranded–in and of itself–makes Williams's decision to check on him reasonable, regardless of where the defendant actually pulled over.  See *id*. (public interest for police to offer assistance to drivers who may be stranded, especially after dark and where assistance may not be readily available).  The fact that the defendant did pull over at the top of the hill only further strengthens the conclusion that it was in the interest of public safety that Williams check on the defendant's welfare because of the restricted visibility of the road.  For these reasons, we conclude that the facts in the record fall under the community caretaking exception to the fourth amendment, thereby making any alleged seizure of the defendant reasonable.  Accordingly, in addition to the finding of a consensual encounter, the reversal of the portion of the circuit court's order that granted the defendant's motion to suppress is also warranted by the community caretaking exception.

¶ 48                   E.  *Defendant's Alternative Argument to Affirm*

¶ 49   The defendant poses an alternative argument that this court should affirm the circuit court's order granting the motion to suppress because–even if the initial encounter was consensual–Williams seized the defendant when he took his license and registration back to the squad car.  According to the defendant, he was not free to leave, and the information

18

known to Williams at that time did not provide a reasonable suspicion that the defendant was driving under the influence. We disagree.

¶ 50 First, the defendant has failed to prove that the seizure was effected when Williams took the defendant's license and registration back to the squad car. As earlier established, a police officer may "ask to examine [an] individual's identification" without turning the encounter into a seizure, as long as the officer does not convey the message that compliance is required. (Internal quotation marks omitted.) *Luedemann*, 222 Ill. 2d at 551. "The encounter becomes a seizure only if the officer, through physical force or a show of authority, restrains the liberty of the vehicle's occupant." *Id*. at 552-53. In this case, Williams did not ask to examine the defendant's license and registration. Rather, the defendant had his license and registration out and in hand when Williams first approached the vehicle, and the defendant offered the documents to Williams. As the State aptly argues, by offering his identification, the defendant was inviting Williams to make a brief inspection of it and was consenting to any resulting delay. The State further argues that if the defendant did not feel free to leave while Williams was checking his license, any perceived restraint of movement was self-imposed because the defendant offered his license and registration to Williams. We agree.

¶ 51 Second, even assuming, *arguendo*, that the defendant was in fact seized when Williams took the license and registration back to the squad car, we find the seizure was justified because there is evidence that a reasonable, articulable suspicion of criminal activity had arisen by that time. See *id.* at 544. The evidence established that Williams received advanced training to detect drivers under the influence of drugs. The defendant was

19

traveling 32 miles per hour in a 55-mile-per-hour zone.  The defendant rolled down his window and wished Williams a "good afternoon," the defendant's speech was slow, the defendant was slumped down in his seat, his movements were deliberate and delayed, and his pants were undone and partially down.  These facts, and any inferences therefrom, led Williams to reasonably conclude that the defendant was driving under the influence of drugs.  As set forth in its order, the circuit court accepted the foregoing evidence about Williams's observations of the defendant as true.

¶ 52    Although the defendant attempts to offer explanations for his behavior, we keep in mind that "[i]t is the trier of fact's responsibility to determine the witnesses' credibility and the weight given to their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence; we will not substitute our judgment for that of the trier of fact on these matters." *People v. Brooks*, 187 Ill. 2d 91, 132 (1999).  Our duty is to give great deference to the circuit court's factual findings, and we will not reverse those findings unless they are against the manifest weight of the evidence.  See *Luedemann*, 222 Ill. 2d at 542.  "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *People v. Davis*, 352 Ill. App. 3d 576, 579 (2004).  Moreover, "a finding is not against the manifest weight of the evidence merely because the record might support a contrary decision." *Graham v. Mimms*, 111 Ill. App. 3d 751, 767 (1982).  Indeed, the existence of reasonable suspicion depends on the totality of the circumstances, and even if innocent explanations could exist for individual factors viewed in isolation, the factors viewed in combination may constitute reasonable suspicion.  See *People v. Ortiz*, 317 Ill. App. 3d 212, 223 (2000).

20

¶ 53    In summary, we find that the established facts, based on a totality of the circumstances, constitute a reasonable articulable suspicion that the defendant was driving under the influence. We further find that those facts were observed by Williams *before* he returned to his squad car with the defendant's identification. Accordingly, any seizure at or after that time was justified, and we disagree with the defendant's proposed alternative argument to affirm the portion of the circuit court's order that granted the defendant's motion to suppress evidence.

¶ 54                                II. Petition to Rescind the SSS

¶ 55                                A. *Standard of Review*

¶ 56    The second issue on appeal is whether the circuit court erred by granting the defendant's petition to rescind the SSS. The Illinois Supreme Court established "a two-part standard of review in an appeal of a petition to rescind." *People v. Hacker*, 388 Ill. App. 3d 346, 350 (2009). "In *People v. Wear*, 229 Ill. 2d 545, 561-62 *** (2008), the supreme court held that the reviewing court will defer to factual findings but will review *de novo* the ultimate determination of whether the petition to rescind should be granted." *Id*.

¶ 57                                B. *Propriety of the Stop*

¶ 58    In his petition, the defendant cited multiple statutory bases for requesting a rescission of the SSS. "In addition to the statutory grounds for rescinding a summary suspension [citation], a suspension may be rescinded where the stop of the defendant's vehicle was improper." *People v. Paige*, 385 Ill. App. 3d 486, 489 (2008). Here, the circuit court did not consider any of the statutory bases cited by the defendant, but granted his petition to rescind

21

solely on its finding that the stop was unreasonable. Because we already found that the stop was *not* unreasonable, we reverse the circuit court's order granting the petition on that basis.

¶ 59                   C. *Defendant's Alternative Arguments to Affirm*

¶ 60    Regardless of the propriety of the stop, the defendant offers several alternative arguments that the circuit court's decision to grant his petition to rescind the SSS should be affirmed, based on the requirements of section 11-501.1 of the Illinois Vehicle Code (Code) (625 ILCS 5/11-501.1 (West 2014)). Although the circuit court made no findings regarding any of these alternative arguments, the record is sufficient for us to address the issues raised by the defendant.

¶ 61                            1. *Motorist Warnings*

¶ 62    First, the defendant argues that the circuit court correctly granted his petition to rescind the SSS because he was not adequately warned by Williams, as required by section 11-501.1(c) of the Code. See 625 ILCS 5/11-501.1(c) (West 2014). "A hearing on a petition to rescind a summary suspension is a civil proceeding in which the driver bears the burden of proof." *People v. Wear*, 229 Ill. 2d 545, 559-60 (2008). "If the driver establishes a *prima facie* case for rescission, the burden shifts to the State to come forward with evidence justifying the suspension." *Id*. at 560.

¶ 63    Here, the defendant concedes that when he called Williams as his witness at the hearing, he elicited no testimony from Williams on the subject of whether warnings were given. It was the defendant's burden to establish a *prima facie* case that the warnings were not given. See *id*. at 559-60. Because the defendant presented no evidence that the warnings were not given, the burden never shifted to the State to prove that the warnings were given.

22

See *id*. at 560.  Accordingly, we disagree with the defendant that the circuit court correctly granted his petition to rescind the SSS because he was not adequately warned.

¶ 64                              2.  *Motorist Signature*

¶ 65    The defendant next contends that the circuit court correctly granted his petition to rescind because he did not acknowledge receipt of the warning by signing his name on the document.  In response, the State correctly notes that the statutory requirement of the driver's signature acknowledging receipt of the warnings was not added to section 11-501.1(c) until January 1, 2016, almost a year after the occurrence of the events in question.  Because the defendant was not statutorily required to sign his name on the warnings on the date in question, we find that he did not meet his *prima facie* burden of showing any statutory violation on that basis.  See *id.* at 559-60.  Accordingly, we disagree with the defendant that the circuit court correctly granted his petition to rescind the SSS because he did not sign his name acknowledging any warnings.

¶ 66                        3.  *Refusal to Submit to Chemical Testing*

¶ 67    The defendant's final argument is that the circuit court correctly granted his petition to rescind the SSS because he did not refuse to submit to and/or complete the chemical tests as required by the Code.  See 625 ILCS 5/11-501.1 (West 2014).  The only evidence presented by the defendant on this issue was through his cross-examination of Trooper Williams, who testified as follows:

> "Q.  I'm going to jump to the police station.  Did you have Mr. Biagi to provide you with a urine sample?
>
> A.  Yes, sir.

23

Q. And did you give him a cup to provide that urine sample in?

A. I provided him water.

Q. Water?

A. Yes, sir.

Q. Okay. And did he ever refuse to give you the urine sample?

A. I asked him about a urine sample, he never explicitly said yes. He acted like he wanted to. However, after an extended period of time he said he couldn't go to the bathroom.

\*\*\*

Q. So it's your testimony that Mr. Biagi said he was unable to urinate?

A. That was his story, yes."

¶ 68 The defendant argues that "[t]he State simply failed to establish that [the defendant] refused testing or failed to complete testing after being properly advised." We find this argument problematic because the burden is on *the defendant* to establish a *prima facie* case that he did not refuse testing. See *id.* Only if he meets that burden would the burden shift to the State. See *id.*

¶ 69 Here, we find the above testimony insufficient to establish a *prima facie* case that the defendant did not refuse testing. "The determination of whether a motorist's physical inability to complete a test constitutes a refusal is made on a case-by-case basis." *People v. Tibbetts*, 351 Ill. App. 3d 921, 929 (2004). However, a defendant's bare claim that he is unable to urinate is insufficient evidence to show that he did not refuse testing. See *id*. There must be evidence demonstrating that it was physically or psychologically impossible

24

for the defendant to urinate. See *id*. There was no such evidence here. For that reason, we find that the defendant did not meet his *prima facie* burden of showing that he did not refuse testing. See *Wear*, 229 Ill. 2d at 559-60. To hold otherwise would allow any defendant to will himself or herself not to urinate, simply claim that they are physically unable to do so, and succeed in having their SSS rescinded based on the argument that they did not refuse testing. For these reasons, we disagree with the defendant that the circuit court correctly granted his petition to rescind the SSS on that basis.

¶ 70    Because the defendant did not establish a *prima facie* case on any of his alternative arguments to affirm based on the requirements of the Code, we reverse the circuit court's order that granted his petition to rescind the SSS.

¶ 71                                   CONCLUSION

¶ 72    For the foregoing reasons, we reverse the April 13, 2015, order of the circuit court of Marion County that granted the defendant's motion to suppress evidence and granted his petition to rescind the SSS.

¶ 73    Reversed.

¶ 74    JUSTICE WELCH, dissenting.

¶ 75    I respectfully disagree with the majority's position that the encounter between the defendant and Williams–prior to Williams's observation of signs that the defendant was under the influence–was consensual and not a seizure. I am mindful of the supreme court decision in *Luedemann*, which concludes that the use of a flashlight to illuminate a vehicle without the presence of some form of coercion does not constitute a seizure. However, I agree with the defendant that *Luedemann* is distinguishable from the present case.

25

¶ 76    In *Luedemann*, the officer testified that he was on patrol in a residential neighborhood when he observed defendant sitting in the driver's seat of a car parked in front of a house. *People v. Luedemann*, 222 Ill. 2d 530, 533 (2006).  As the officer's vehicle approached the defendant's vehicle, the officer observed defendant reach toward the floorboard on the passenger side of the car and then return to a seated position.  *Id.* at 534.  The officer then observed defendant slump down approximately six to eight inches in his seat.  *Id.*  The officer drove past defendant's vehicle and parked in the center of the street.  *Id.*  The officer then exited his vehicle and approached defendant's vehicle, shining a flashlight around and into defendant's car as he approached.  *Id.* at 534, 539.

¶ 77    Unlike *Luedemann*, the defendant in the present case was not parked on the side of the road in a residential neighborhood.  The defendant was driving on an oil and chip rural road with no lane markings at night.  The road was dark and it was lightly raining.  The defendant observed Williams approaching from behind and quickly gaining on his vehicle.  The defendant determined that it was necessary to partially pull over on the shoulder to allow the vehicle to pass.  After pulling over, he observed the vehicle pull over directly behind him instead of passing.  Although Williams testified that he did not pass the defendant's vehicle because the defendant came to a stop at the top of a hill and Williams was unable to see any traffic that may be approaching from the opposite side, the circuit court concluded, after watching the video, that there was sufficient room and vision to pass safely.  After parking his marked police patrol car behind the defendant, Williams activated his "takedown" lights, which are two bright LED white lights that are inside the light bar on top of the patrol car,

26

and his emergency rear flashers. He then approached the defendant's vehicle in an authoritative manner, being in full uniform with a visible weapon and his flashlight drawn.

¶ 78 Considering the totality of the circumstances, Williams's actions constituted a show of authority, indicating that the defendant was not free to terminate the encounter. The use of the takedown lights in conjunction with the other coercive behavior exhibited by Williams transformed this encounter into a seizure. Thus, I would have affirmed the circuit court's order granting the defendant's motion to suppress.

¶ 79 Furthermore, I disagree with the majority's position that the "assumed seizure" was reasonable under the community caretaking doctrine. I find it significant that the circuit court found that the stop was not reasonable in that there was nothing in the operation and stop of the defendant's vehicle that would cause one to suspect that the occupants of the vehicle needed assistance. The court concluded that the defendant's vehicle appeared in the video to be operating correctly, *i.e.*, the lights were all on, the engine was running, the tires were inflated, and the brakes worked. The court found that the defendant's vehicle traveled smoothly in its own lane until it stopped along the road.

¶ 80 While stopping, the defendant's vehicle appeared to be under control; the turn signal was used, the stop was controlled and gradual, and the defendant left enough room for another vehicle to travel around it safely. The court noted that the defendant did not exit his vehicle to seek assistance from the trailing vehicle. The court noted that Williams was able to observe the operation of the defendant's vehicle for a period of time prior to the stop as Williams did not come upon the vehicle already parked. I find nothing in the record to

support a conclusion that the circuit court's findings of fact are against the manifest weight of the evidence.

¶ 81 Viewing Williams's actions objectively, the evidence did not indicate any noninvestigatory purpose for the stop. Although Williams notified dispatch that he was conducting a motorist assist, there was not sufficient evidence in the record to indicate that the defendant required assistance. Instead, it appears that Williams was attempting to investigate criminal activity under the guise of community caretaking. Thus, I agree with the circuit court and find that that the seizure was not justified by the community caretaking doctrine. Accordingly, because I would affirm the circuit court's decision to grant the defendant's motion to suppress as well as the court's decision to grant the defendant's petition to rescind statutory summary suspension, I respectfully dissent from the majority's disposition in this case.

2017 IL App (5th) 150244

NO. 5-15-0244

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

THE PEOPLE OF THE STATE OF ILLINOIS,                )        Appeal from the
                                                                                )        Circuit Court of
        Plaintiff-Appellant,                                           )        Marion County.
                                                                                )
v.                                                                              )        No. 15-DT-03
                                                                                )
CHRISTOPHER BIAGI,                                          )        Honorable
                                                                                )        Mark W. Stedelin,
        Defendant-Appellee.                                        )        Judge, presiding.
_____

**Rule 23 Order Filed:**              October 18, 2016
**Motion to Publish Granted:**   January 5, 2017
**Opinion Filed:**                      January 5, 2017
_____

**Justices:**            Honorable James R. Moore, P.J.

                              Honorable Melissa A. Chapman, J.,
                              Concurred
                              Honorable Thomas M. Welch, J.,
                              Dissented

_____

**Attorneys**       Patrick Delfino, Director, David J. Robinson, Acting Deputy Director, Jennifer
**for**                Camden, Staff Attorney, Office of the State's Attorneys Appellate Prosecutor,
**Appellant**       Fifth Distict Office, 730 E. Illinois Highway 15, Suite 2, P.O. Box 2249, Mt.
                         Vernon, IL 62864; Hon. Bill J. Milner, State's Attorney, Marion County
                         Courthouse, P.O. Box 157, Salem, IL 62881
_____

**Attorneys**       Michael J. Pelletier, State Appellate Defender, Ellen J. Curry, Deputy Defender,
**for**                Elizabeth M. Crotty, Assistant Appellate Defender, Office of the State Appellate
**Appellee**       Defender, Fifth Judicial District, 909 Water Tower Circle, Mt. Vernon, IL
                         62864
_____