*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CF-103

ROYALE MCGLENN SR., APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-9825-17)

(Hon. Kimberley Knowles, Trial Judge)

(Argued April 30, 2019                                    Decided July 11, 2019)

*Paige Sharpe*, with whom *Mary Kennedy* was on the brief, for appellant.

*Steven B. Snyder*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney, and *Elizabeth Trosman* and *Puja Bhatia*, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER, THOMPSON, and MCLEESE, *Associate Judges*.

MCLEESE, *Associate Judge*: Appellant Royale McGlenn Sr. appeals from his convictions for firearms offenses, arguing that the trial court erroneously denied his motion to suppress evidence. We affirm.

**I.**

Viewed in the light most favorable to the trial court's ruling, the evidence at the suppression hearing was as follows. At approximately 10:45 pm on June 5, 2017, Metropolitan Police Department officers Sherwin Charles and Angela Galli responded to a report of an assault in progress. When Officer Charles arrived he saw Mr. McGlenn standing outside in front of the location provided in the report. Mr. McGlenn, who matched the description of the suspected assailant, was sweating, not well-oriented, and confused. Officer Charles smelled alcohol or PCP coming from Mr. McGlenn. Officer Charles directed Mr. McGlenn to stop, so that Officer Charles could investigate the reported assault. Mr. McGlenn did not comply, so Officer Charles grabbed Mr. McGlenn. Mr. McGlenn continued to resist, pulling out of his shirt. In Officer Charles's experience, intoxicated individuals tend to be aggressive and noncompliant. For that reason, and given Mr. McGlenn's resistance, Officer Charles handcuffed Mr. McGlenn, to safely detain him while officers investigated the assault. Mr. McGlenn resisted being handcuffed. Officer Charles also radioed for an ambulance to come and assess Mr. McGlenn's medical condition. It is standard practice to call an ambulance to evaluate individuals who are suspected of being high on PCP, because such individuals can suddenly become incredibly aggressive and very strong, and often hurt themselves.

When Officer Galli arrived, she saw Officer Charles restraining Mr. McGlenn. Officer Galli smelled PCP coming from Mr. McGlenn's person. Mr. McGlenn "appeared to be high on something" and was displaying disorientation and "broken thought process." Officer Galli interviewed Mr. McGlenn's mother, who had called the police. Mr. McGlenn's mother explained that Mr. McGlenn had come into her home and was yelling for his son, who was in bed. Mr. McGlenn's mother concluded that Mr. McGlenn had been smoking something, because he did not usually act the way he was acting. Mr. McGlenn's mother was so frightened that she ran to a neighbor's house and called the police. Mr. McGlenn's mother indicated, however, that no actual assault had occurred. Mr. McGlenn's mother told the police that she wanted Mr. McGlenn to be treated because he was under the influence of something.

Officer Galli informed Officer Charles of her conversation with Mr. McGlenn's mother. The officers decided not to arrest Mr. McGlenn for assault, but they also decided not to release him until an ambulance came to evaluate him, because he might be a threat to himself or others if he were released. The officers decided to leave Mr. McGlenn in handcuffs until the ambulance arrived, to prevent him from leaving or hurting himself or the officers. During the officers' encounter

with Mr. McGlenn, Mr. McGlenn was angry, irate, and upset; was yelling; fumbled to remember information; slurred words; was at one point incoherent; seemed to be "out of it"; and frequently repeated himself. Once he was handcuffed, however, Mr. McGlenn did not act aggressively towards the officers or threaten them. Mr. McGlenn also was able to answer a number of the officers' questions. At one point, Mr. McGlenn stated that he did not remember having seen his mother that evening.

About ten minutes after the officers decided not to arrest Mr. McGlenn, and while they were waiting for the ambulance to arrive, Mr. McGlenn told the officers that he had a gun in his pants. Officer Charles then recovered a gun from Mr. McGlenn's pants. The officers arrested Mr. McGlenn for possessing the gun. Before he was transported from the scene, Mr. McGlenn was evaluated by medical personnel, who determined that he did not need to go to the hospital.

The trial court credited the officers' testimony, much of which was corroborated by body-worn camera footage that had been admitted into evidence at the suppression hearing. The trial court determined that even after the assault investigation was over, the officers could lawfully continue to detain Mr. McGlenn until an ambulance came, "for his safety and the safety of the community." Specifically, the trial court relied upon the facts that Mr. McGlenn (1) was sweating

heavily and breathing hard; (2) appeared disoriented; (3) was non-compliant to the point of pulling out of his shirt; (4) was at one point incoherent; (5) was slurring his speech; (6) did not seem to understand what was going on, particularly at the beginning of the encounter; (7) had behaved in a frightening and aggressive way in his mother's home; (8) appeared to be high on PCP; (9) stated that he did not remember having seen his mother that evening; and (10) kept repeating himself.

## II.

"When reviewing the denial of a motion to suppress, we defer to the trial court's findings of fact, but we determine questions of law *de novo*." *Tuckson v. United States*, 77 A.3d 357, 360 (D.C. 2013) (internal quotation marks omitted). Applying this standard, we affirm. Specifically, Mr. McGlenn challenges the officers' continued detention of him even after it was clear that there was no basis to charge him with assault. We hold that the officers had authority to continue to detain Mr. McGlenn under the community-caretaking doctrine. (Although neither the trial judge nor the United States specifically used the phrase "community caretaking" in the trial court, Mr. McGlenn has not argued in this court that the United States forfeited reliance upon the community-caretaking doctrine, and we therefore have no occasion to address that question.)

Nearly fifty years ago, the Supreme Court noted that local police officers frequently engage in "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). Many other courts have elaborated on that point. *See, e.g.*, *State v. McCormick*, 494 S.W.3d 673, 683 (Tenn. 2016) ("Police officers wear many hats: criminal investigator, first aid provider, social worker, crisis intervener, family counselor, youth mentor and peacemaker, to name a few. They are charged with the duty to protect people, not just from criminals, but also from accidents, natural perils and even self-inflicted injuries.") (internal quotation marks omitted); *Ullom v. Miller*, 705 S.E.2d 111, 120 (W. Va. 2010) ("[L]aw enforcement personnel are expected to engage in activities and interact with citizens in a number of ways beyond the investigation of criminal conduct. Such activities include a general safety and welfare role for police officers in helping citizens who may be in peril or who may otherwise be in need of some form of assistance."); *Williams v. State*, 962 A.2d 210, 216-17 (Del. 2008) ("[L]ocal police have multiple responsibilities, only one of which is the enforcement of criminal law. The modern police officer is a 'jack-of-all-emergencies,' with complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses; by default or design he [or she] is also

expected to aid individuals who are in danger of physical harm, assist those who cannot care for themselves, and provide other services on an emergency basis.") (footnote, brackets, ellipsis, and internal quotation marks omitted); *see also* I *American Bar Association Standards for Criminal Justice* Standard 1-1.1(b), at 1-10 (2d ed. 1980) ("[T]he police should be recognized as having complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses.  Such other police tasks include . . . [providing] assistance to citizens in need of help such as the person who is mentally ill, the chronic alcoholic, or the drug addict."); *id.* Standard 1-2.2(f) cmt. at 1-42 ("Much of policing consists of providing care and assistance to those who cannot care for themselves because of their age, their state of health, or the influences they come under – the young and the old, the physically disabled, the mentally ill and retarded, those intoxicated by alcohol, and those addicted to drugs.").

It is widely recognized that police officers' community-caretaking responsibilities can extend to those who appear to be intoxicated on alcohol or other substances.  *See, e.g.*, *Gallegos v. City of Colo. Springs*, 114 F.3d 1024, 1029 n.4 (10th Cir. 1997) (brief detention of distraught pedestrian who smelled of alcohol and was unsteady on his feet was valid exercise of officer's community-caretaking function); *State v. Shiffermiller*, 922 N.W.2d 763, 777 (Neb. 2019) ("[D]epending

on the particular facts presented, the community caretaking exception may be appropriate when a defendant is visibly intoxicated and presenting a danger to himself and the general public."); *People v. Biagi*, 68 N.E.3d 829, 840 (Ill. App. Ct. 2017) ("Community caretaking tasks include . . . helping inebriates find their way home . . . .") (internal quotation marks omitted); *see generally* 4 Wayne R. LaFave, *Search and Seizure* § 9.2(b), at 384-87 (5th ed. 2012) ("[O]fficers do not violate the Fourth Amendment . . . if they stop a pedestrian who . . . is possibly intoxicated so as to constitute a hazard to himself and to others.") (internal quotation marks omitted).

In the District of Columbia, the legislature has specifically addressed the powers and responsibilities of police officers when they see intoxicated persons. It is a criminal offense to be intoxicated so as to endanger the safety of oneself or another. D.C. Code § 25-1001(c) (2012 Repl.). In the absence of such danger, a person who is intoxicated in public is to be treated in accordance with D.C. Code § 24-604(a) (2012 Repl.), which directs the police to take or send the person home, take or send the person to a public or private health facility, or take the person to a detoxification center. D.C. Code § 25-1001(e) (2012 Repl.). The Metropolitan Police Department's General Orders reiterate that statutory requirement. General Order PCA – 501.03, Part IV.A (Feb. 25, 2003).

In *Cady,* the Supreme Court relied on police officers' community-caretaking responsibilities to hold that it was reasonable for officers to conduct a warrantless search of the car of an intoxicated police officer, to locate and secure the officer's service revolver. 413 U.S. at 434-48. Since *Cady*, many courts have had occasion to consider whether police conduct was lawful under the community-caretaking doctrine, and courts have taken a variety of approaches to the doctrine. *Hawkins v. United States*, 113 A.3d 216, 220-21 (D.C. 2015). This court has adopted the following test to determine whether community-caretaking conduct is reasonable and lawful under the Fourth Amendment: the government must show

> 1) by specific and articulable facts that the government's conduct was totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute; 2) the government's conduct was reasonable considering the availability, feasibility, and effectiveness of alternatives to the officer's action; 3) the officer's action ended when the citizen or community was no longer in need of assistance; 4) the government's interests outweigh the citizen's interest in being free from minor government interference.

*Id.* at 222.

Mr. McGlenn argues, however, that the test we adopted in *Hawkins* is inapplicable, because the community-caretaking doctrine is limited to warrantless

searches of vehicles and therefore does not apply to cases, such as the present case, in which a person was seized. We disagree.

*Cady* involved the warrantless search of a car that had already been seized on other grounds, and the analysis in *Cady* as to whether the search at issue was lawful turned in part on the principle that there is a lesser expectation of privacy in cars. 413 U.S. at 440-48. Some courts therefore have interpreted the community-caretaking doctrine to be narrowly limited to "cases involving automobile searches." *United States v. Bute*, 43 F.3d 531, 535 (10th Cir. 1994). Many courts, however, have extended the community-caretaking doctrine more generally, to cases involving seizures of cars, seizures of persons, and searches of homes. *State v. Smith*, No. 20180101-CA, 2019 WL 1941460, at *3 (Utah Ct. App. May 2, 2019) ("Our supreme court—like many other state courts—has applied the community caretaking doctrine to justify the seizure of a vehicle to ensure the safety of the occupants.") (internal quotation marks omitted); *Corrigan v. District of Columbia*, 841 F.3d 1022, 1034 (D.C. Cir. 2016) (noting that some federal circuits have applied community-caretaking doctrine to warrantless searches of homes); *Vargas v. City of Philadelphia*, 783 F.3d 962, 972 (3d Cir. 2015) ("We agree that the community caretaking doctrine can apply in situations when, as is arguably the case here, a

person outside of a home has been seized for a non-investigatory purpose and to protect that individual or the community at large.") (citing cases).

This case does not involve the application of the community-caretaking doctrine to a warrantless search of a home. Searches of the home can raise distinctive issues under the Fourth Amendment. *See, e.g.*, *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) ("At the [Fourth] Amendment's very core stands the right of a [person] to retreat into his [or her] own home and there be free from unreasonable governmental intrusion.") (internal quotation marks omitted). We therefore express no view as to the applicability of the community-caretaking doctrine to searches of a home. We do, however, join the many other courts to have held that the community-caretaking doctrine is applicable to temporary seizures of persons who are out in public. As we have already explained, the community-caretaking responsibilities of the police are not limited to circumstances involving searches of vehicles. To the contrary, those responsibilities are understood to run more broadly to situations that may reasonably call for the temporary detention of a person to protect that person or others.

We do not minimize the significance of a temporary seizure of the person. As the Supreme Court has noted, however, such seizures -- if appropriately limited --

are "far more minimal intrusion[s]" than an arrest. *Illinois v. Wardlow*, 528 U.S. 119, 126 (2000). For that reason, such seizures, when directed at the investigation of crime, are permissible without a warrant and based on articulable suspicion, a level of suspicion that is less demanding than probable cause. *Terry v. Ohio*, 392 U.S. 1 (1968).

For these reasons, we hold that the community-caretaking doctrine is applicable to temporary seizures of persons. Saying that the doctrine is applicable of course does not mean that the doctrine's requirements have been met in a given case. We therefore turn to the latter inquiry. As previously noted, in this jurisdiction a community-caretaking seizure of a person will be lawful only if the government shows

> 1) by specific and articulable facts that the government's conduct was totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute; 2) the government's conduct was reasonable considering the availability, feasibility, and effectiveness of alternatives to the officer's action; 3) the officer's action ended when the citizen or community was no longer in need of assistance; 4) the government's interests outweigh the citizen's interest in being free from minor government interference.

*Hawkins*, 113 A.3d at 222. The trial court did not apply these requirements, but Mr. McGlenn has not objected on that basis in this court or requested a remand for the trial court to apply the requirements in the first instance. Instead, Mr. McGlenn has

argued only that the record and the trial court's findings do not support a conclusion that the requirements were met in this case. We disagree. Mr. McGlenn explicitly concedes that the first requirement was met, and we accept that concession. We also conclude that the remaining requirements were met in this case.

First, we agree with the trial court that the officers' decision to continue to detain Mr. McGlenn while waiting for an ambulance was reasonable considering the alternatives. Given the circumstances found by the trial court, *supra* at 4-5, the officers reasonably feared that Mr. McGlenn might have been a danger to himself or others if the officers had simply walked away. *See also, e.g.*, *Coates v. United States*, 558 A.2d 1148, 1151 (D.C. 1989) (noting expert testimony that PCP users "may act in a very violent and irrational way"). Keeping Mr. McGlenn under control until he could be medically evaluated was a reasonable response. In fact, the officers could have been subject to criticism or even civil liability had they simply released Mr. McGlenn and Mr. McGlenn had then hurt himself or someone else. *Cf., e.g.*, *Meehan v. Thompson*, 763 F.3d 936, 944 (8th Cir. 2014) ("[P]olice officers must walk [a fine line] in dealing with intoxicated individuals. Police officers are often constitutionally obligated to care for those individuals, and because alcohol can have disparate effects on different people, police officers must be given some latitude in evaluating whether an intoxicated individual can properly care for herself. Had

[Officer] Thompson permitted Meehan to walk home or to Lund's, he would have risked exposing himself to exactly the same kind of civil liability that Meehan asserts in this case.").

Mr. McGlenn argues that the officers had other less intrusive options, including asking Mr. McGlenn to leave the area and stay elsewhere or having a friend come pick Mr. McGlenn up. Each of those options seems problematic. The first would have left Mr. McGlenn free to wander around unsupervised and without having been medically evaluated. The second might have provided some supervision, but might not have been less intrusive depending on how long it would have taken for a suitable friend to arrive. In any event, the availability of a less-restrictive course of action does not necessarily render the chosen course of action unreasonable. *Hawkins*, 113 A.3d at 222 (in context of community-caretaking doctrine, "This court does not require the government to pursue the least restrictive means of correcting the problem.").

Second, Mr. McGlenn's detention under the community-caretaking doctrine was limited to the time during which such detention was reasonably necessary. The initial period of detention was to investigate the assault. Once the officers completed that investigation, they detained Mr. McGlenn for approximately ten minutes to wait

for an ambulance to come. *Supra* at 4. After Mr. McGlenn volunteered that he had a gun, the detention thereafter was in connection with his arrest for possessing the gun.

Third, we conclude that the government's interests in keeping the community safe from Mr. McGlenn -- and in keeping Mr. McGlenn himself safe -- outweighed Mr. McGlenn's interest in being free from the ten-minute period of detention at issue. In that regard, we note that a number of courts have upheld brief detentions in comparable circumstances under the community-caretaking doctrine. *See, e.g.*, *United States v. Gilmore*, 776 F.3d 765, 766-72 (10th Cir. 2015) (defendant was walking unsteadily, was in dangerous area, and appeared to be intoxicated and disoriented); *Tinius v. Carroll Cty. Sheriff Dep't*, 321 F. Supp. 2d 1064, 1069, 1075-76 (N.D. Iowa 2004) (defendant was walking along road, intoxicated and "out of it," and inappropriately dressed for weather; officer seized defendant and transported him to hospital); *Shiffermiller*, 922 N.W.2d at 771, 777-78 (defendant was agitated and appeared to be intoxicated, defendant's car was nearby, and detention was while officers were arranging to transport defendant to father's home); *People v. Queen*, 859 N.E.2d 1077, 1084 (Ill. App. Ct. 2006) (defendant fell out of tree and, although uninjured, appeared to be intoxicated); *Commonwealth v. Waters*, 456 S.E.2d 527, 530-31 (Va. Ct. App. 1995) (officer saw defendant swaying and walking unsteadily;

assuming that defendant was seized during initial stages of encounter, seizure was reasonable based on suspicion that defendant was intoxicated, ill, or in need of help). Mr. McGlenn has not cited, and we have not found, any comparable case that has held such a detention unlawful.

Finally, Mr. McGlenn argues that upholding the seizure in this case will mean that the police will be able to seize any person suspected of being intoxicated. We do not agree. Our holding in this case is tied to the circumstances of this case and comparable situations. Specifically, in this case the police had information that Mr. McGlenn had been acting in a frightening manner, causing his mother to run to a neighbor's house, call the police, and tell the police that Mr. McGlenn needed treatment; there was reason to believe that Mr. McGlenn was under the influence of PCP, a drug known to cause sudden bursts of aggressive and violent behavior; Mr. McGlenn physically resisted being detained during the initial investigation into the possible assault; Mr. McGlenn was angry, irate, and upset; and Mr. McGlenn showed signs of incoherence and disorientation. We express no view about cases presenting weaker grounds for a community-caretaking seizure.

For the foregoing reasons, the judgment of the Superior Court is

*Affirmed.*